# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39802**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Michael S. BUTLER**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 20 August 2021

————————————

*Military Judge:* Bryon T. Gleisner (motions); Wesley A. Braun (arraignment, motions, and trial).

*Approved sentence:* Confinement for 12 months, forfeiture of all pay and allowances, and a reprimand. Sentence adjudged 14 June 2019 by GCM convened at Maxwell Air Force Base, Alabama.

*For Appellant:* Major Amanda E. Dermady, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges.*

Senior Judge POSCH delivered the opinion of the court. Judge MEGINLEY filed a separate opinion concurring in part, dissenting in part, and dissenting in the result in part. Judge RICHARDSON filed a separate opinion concurring in part, and dissenting in part and in the result.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Senior Judge:

A military judge sitting as a general court-martial found Appellant guilty, contrary to his pleas, of one charge and specification of aggravated assault, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928, and one charge and specification of drunk and disorderly conduct, in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1] Appellant also pleaded not guilty and was acquitted of two specifications of dereliction of duty, three specifications of aggravated assault, and two specifications of reckless endangerment, charged as violations of Articles 92, 128, and 134, UCMJ, 10 U.S.C. §§ 892, 928, 934, respectively. The adjudged and approved sentence consisted of confinement for 12 months, forfeiture of all pay and allowances, and a reprimand.

On appeal, Appellant raises three issues: (1) the legal and factual sufficiency of his conviction for aggravated assault enumerated in Specification 1 of Charge II; (2) the legal and factual sufficiency of his conviction for drunk and disorderly conduct enumerated in Specification 1 of Charge III; and (3) that the findings and sentence must be set aside, and the charges dismissed with prejudice, to negate the effects of actual and apparent unlawful command influence (UCI). In addition, we identify the issue whether Appellant is entitled to relief for facially unreasonable delay during appellate review of his case.

A divided three-judge panel of this court resolves the first and second issues against Appellant, and resolves, in part, the third issue in Appellant's favor: we find unremediated actual and apparent UCI in the accusatory phase of Appellant's court-martial. We therefore set aside the findings of guilty and the sentence and dismiss the charges and specifications without prejudice to the Government's right to reinstitute court-martial proceedings against Appellant for the same offenses. We reach this result in separate opinions of the judges assigned to a duly constituted panel of this court:

- Senior Judge Posch finds actual and apparent UCI in the decision to prefer charges, and would set aside the findings of guilty and the sentence, and dismiss the charges and specifications *without prejudice*. Senior Judge Posch considered Appellant's challenges to the legal and factual sufficiency of both convictions as an alternative basis for dismissal with prejudice, and concludes both convictions are legally and factually sufficient. Senior Judge Posch finds Appellant is not entitled to relief for facially unreasonable delay during appellate review.

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

- Judge Meginley joins Senior Judge Posch's opinion finding actual and apparent UCI in the accusatory phase of Appellant's court-martial, but would dismiss, *with prejudice*, the charges and specifications. Judge Meginley also finds Appellant's drunk and disorderly conduct conviction factually insufficient and would, therefore, set aside the findings of guilty to Specification 1 of Charge III, and Charge III, and dismiss Specification 1 of Charge III, and Charge III, with prejudice, on this additional basis.

- Judge Richardson would remand the case because the military judge did not fully develop the record or make findings as to whether actual or apparent UCI reached the convening authority who referred the charges. At the same time, Judge Richardson finds that dismissal with prejudice is not warranted because the Government proved beyond a reasonable doubt that any UCI in the preferral stage of Appellant's court-martial did not place an intolerable strain upon the public's perception of the military justice system. Additionally, Judge Richardson joins Senior Judge Posch in finding both convictions legally and factually sufficient and that Appellant is not entitled to relief for facially unreasonable delay during appellate review.

Because Senior Judge Posch, joined by Judge Meginley, finds dismissal is the appropriate remedy for UCI, but Judge Meginley stands alone in finding dismissal with prejudice should be the result, we conclude that dismissal *without prejudice* of all specifications and charges of which Appellant was convicted is the judgment of the court. Finding no further error, the case is returned to The Judge Advocate General. A rehearing is authorized.

## I. BACKGROUND

Appellant was assigned as an instructor pilot with the 87th Flying Training Squadron at Laughlin Air Force Base (AFB), Texas, when he engaged in the conduct underlying the two convictions under review. Each conviction is founded on separate incidents that Appellant's squadron commander individually addressed through administrative action before charges were preferred for the same conduct.

During the relevant period, Appellant had been suspended from instructor pilot duties and other flying operations at Laughlin AFB. That suspension followed the charged aggravated assault incident in November 2017 for which Appellant had received a letter of admonishment (LOA) in January 2018 from his squadron commander, and was later tried and convicted. In May 2018, Appellant was verbally counseled by his squadron commander for drunk and disorderly conduct, and Appellant was tried and convicted of an offense for this incident as well.

Although the particulars of Appellant's two convictions are of consequence, a brief overview of Appellant's chain of command is necessary before a full account of his case can unfold. At Laughlin AFB, Appellant's squadron, group, and wing commanders reported to Major General (Maj Gen) Patrick Doherty who commanded The Nineteenth Air Force (19 AF/CC).[2] Maj Gen Doherty was the general court-martial convening authority (GCMCA) over Laughlin AFB and he reported to Lieutenant General (Lt Gen) Steven Kwast who commanded Air Education and Training Command (AETC/CC).[3]

By August 2018, these senior officers and their staffs would learn more about Appellant's behavior, and about other times when it appeared Appellant had failed to meet standards. In time, these leaders resolved that they had been ill-informed, even misinformed, about Appellant's conduct and fitness for duty, and what his chain of command at Laughlin AFB knew and did in response. In the span of just under one year after the aggravated assault incident, inquiries directed by these leaders and their staffs would cause them to question and generally disagree with decisions made by Appellant's chain of command as regards Appellant and other officers who were assigned to Laughlin AFB. These various inquiries went beyond military justice decisions and reached leadership, culture, and the safety of personnel under their charge.[4] One of the more informal inquiries was undertaken personally by Maj Gen Doherty. In due course, Maj Gen Doherty grew concerned that his impartiality with respect to the disposition of discipline matters that involved Appellant would be open to question.

Owing to this concern, in mid-to-late October 2018, Appellant was directed to report to the Holm Center[5] at Maxwell AFB where the judicial proceeding

---

[2] This opinion quotes the military judge and others who referred at times to The Nineteenth Air Force and its commander as "19 AF" and "19 AF/CC," respectively. Likewise, "base" and "wing" are interchangeable with "Laughlin AFB."

[3] Following service convention, the military judge's ruling refers to Lt Gen Kwast as the "AETC/CC," that is, the commander of AETC.

[4] In the same month as the incident that was the basis for Appellant's LOA, a T-38 aircraft accident killed an instructor pilot in Appellant's squadron. Among other incidents—including some that happened before matters involving Appellant came to a head—in the following year, one instructor pilot who had been Appellant's roommate was disciplined for giving a trainee a vulgar call sign, and another was suspected of an unprofessional relationship with a student.

[5] The Jeanne M. Holm Center for Officer Accessions and Citizen Development has responsibility for officer recruiting, training, and commissioning programs. Two of its more widely identified programs are Officer Training School and the Reserve Officers Training Corps (ROTC), which operates from detachments at colleges and universities. The Holm Center also directs Junior ROTC programs on high school campuses.

under review was initiated and would run its course. The Holm Center was commanded at the time by Brigadier General (Brig Gen) Christopher Niemi who reported to Lt Gen Anthony Cotton who commanded Air University (also at Maxwell AFB). Lt Gen Cotton was the GCMCA over the Holm Center, and, like Maj Gen Doherty who commanded The Nineteenth Air Force, Lt Gen Cotton reported to Lt Gen Kwast at AETC.

Within a matter of days after Appellant arrived at Maxwell AFB, Lt Gen Kwast relieved, for cause, Appellant's squadron, group, and wing commanders at Laughlin AFB. At the same time, Lt Gen Kwast explained in widely disseminated communications that he was holding these commanders to account for, among other reasons, their failures to take adequate and sufficient action to address officer misconduct at the base. Soon after, in early November 2018 Brig Gen Niemi preferred charges against Appellant, including the two charges under review. After a preliminary hearing officer determined that all the charges met a "very low probable cause standard," Lt Gen Cotton promptly referred the charges to trial by general court-martial.

Before trial, Appellant identified actions and statements by Lt Gen Kwast, and by commanding generals of units subordinate to AETC, that he believed violated his right to a court-martial free from the undue influence of superiors. Appellant claimed the conduct of these general officers "so influenced the accusatory[6] and potentially the adjudicative phases of his trial, that the case against him must be dismissed with prejudice." Among Appellant's allegations of UCI are claims he made against the commanders who preferred and referred the charges. His principal contention in the pretrial motion was that Brig Gen Niemi "was under immense pressure to prefer court-martial charges." At the same time, Appellant claimed "[c]ircumstantial evidence supports the idea that UCI played a role" in Lt Gen Cotton's "decision to refer the case to trial by general court-martial."[7] To this end, Appellant explained that, "[c]learly, referral was a foregone conclusion" after Lt Gen Cotton was in receipt of charges that Brig Gen Niemi had preferred and then forwarded to him for disposition.

---

[6] So called "accusatory" unlawful command influence (UCI) is generally understood to mean issues related to the preferral, forwarding, and referral of charges. *See United States v. Weasler*, 43 M.J. 15, 17 (C.A.A.F. 1995).

[7] Appellant illustrated this assertion in his pretrial motion by making the point that Lt Gen Cotton referred the charges and specifications without modification the day after the Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing officer issued his report. That report, Appellant observes, made "numerous suggestions to modify the charges and specifications, all of which were (and still are) clearly justified by the state of the evidence, warranted by the law, and minor in character."

5

Appellant's pretrial motion claimed that actual and apparent UCI by senior leaders had an effect on the judgments of these general officers and the fairness of judicial proceedings. As to the latter assertion, he believed that an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor significant doubt about the fairness of the accusatory phase of his court-martial. Appellant explained that he was charged and brought to trial in no small measure because of undue influence that was exerted on Brig Gen Niemi and Lt Gen Cotton by two senior officers. The first of these senior officers was Maj Gen Doherty; the other was Lt Gen Kwast.

## A. Transfer to Air University

In August 2018, Maj Gen Doherty informed Lt Gen Kwast that his leadership team at Laughlin AFB was aware of his concern for their "lack of engagement, judgment, and inaction" in matters involving Appellant. Among Maj Gen Doherty's concerns were serious failures by these leaders in "minimizing" Appellant's misconduct over a nine-month period beginning in November 2017 when Appellant engaged in the conduct underlying his LOA (and later conviction for aggravated assault). As a result, Maj Gen Doherty took it upon himself to issue directives he deemed essential for the safety and well-being of Appellant and other personnel at the base.

At the same time as these affairs at the base drew Maj Gen Doherty's attention and action, he and his staff judge advocate (SJA) grew concerned that his personal intervention might call into question his impartiality with respect to the disposition of discipline matters that concerned Appellant. For this reason, on 25 September 2018, Maj Gen Doherty sought permission from Lt Gen Kwast to hand off Appellant's case to a different GCMCA within AETC, but one still subordinate to Lt Gen Kwast.

Lt Gen Cotton, who commanded Air University, was identified as the appropriate GCMCA to receive Appellant's case, and, in due course, Appellant as well. In a memorandum prepared for Maj Gen Doherty's signature and Lt Gen Cotton's indorsement, on 11 October 2018 Lt Gen Cotton accepted transfer of "*U.S. v. Butler*." Charges would be preferred on 6 November 2018 and a court-martial would convene at Maxwell AFB in the middle of the following year.

The events between the transfer of Appellant's case on 11 October 2018 and the preferral of charges on 6 November 2018 are most significant to the resolution of this appeal. On 30 October 2018, Lt Gen Kwast announced in a teleconference with subordinate general officers, and in widely reported public statements, that he had relieved the wing commander, the operations group commander, and the 87th Flying Training Squadron commander at Laughlin AFB. An official news release from the AETC Office of Public Affairs explained

Lt Gen Kwast's decision followed "investigations which revealed chronic leadership failures" at the base.

One of those investigations was directed by Lt Gen Kwast to find the causes and circumstances of recent officer misconduct. Appellant was one of several officers assigned to Laughlin AFB whose conduct was examined, and the command response scrutinized.

## B. Preferral of Charges

When he received Appellant's case in mid-to-late October 2018, Brig Gen Niemi "was told almost nothing" about Appellant, much less why plans had been set in motion to send Appellant to his unit. Brig Gen Niemi testified,

> I remember distinctly some frustration because I didn't understand the scenario. The only details that I recall were passed to me through the [SJA] at the Holm Center, and they were that an individual was going to be transferred to the Holm Center while judicial proceedings played out. . . . I received no details about his case.

Because he had not been provided any information regarding the events surrounding Appellant when Appellant was at Laughlin AFB, Brig Gen Niemi "was concerned to the point where [he] approached [Lt Gen] Cotton to clarify that, indeed, Captain Butler was going to be transferred to the Holm Center" in temporary duty (TDY) status. He reached out to Lt Gen Cotton because, in his words,

> It didn't make any sense to me, because there was so little detail. And at that time, [Lt Gen Cotton] said, "Yes. He is going to be TDY to the Holm Center, and I would like you to sit there and be responsible for taking a look at whatever evidence you have got and make a recommendation."

Soon enough, Brig Gen Niemi was given a copy of a report of investigation. Around the same time he reviewed that report, Brig Gen Niemi made the connection that Appellant's case was related to Lt Gen Kwast's decision to relieve the commanders at Laughlin AFB.

About two weeks after Appellant arrived at Maxwell AFB, and after receiving the advice of the SJA at the Holm Center, Brig Gen Niemi preferred charges, including the two charges under review, which as previously stated, were based on the same incidents for which Appellant had received administrative action from his squadron commander earlier in the year. Lt Gen Cotton subsequently referred the same charges Brig Gen Niemi had preferred.

**C. Appellant's Pretrial UCI Motion and Ruling**

Before arraignment, Appellant served his UCI motion on the Government, comprising 485 pages of argument, sworn statements, emails, and other attachments. The Government's written opposition to Appellant's motion included 69 attachments. Without objection, counsel for both parties liberally cited and relied on these attachments as evidence to support their respective positions, as does this court in reaching its decision.

Although the Government's brief addressed Appellant's claim of accusatory UCI affecting preferral, the brief was silent as to Appellant's claim that UCI tainted Lt Gen Cotton's referral decision. Judge Braun, the military judge who presided over the UCI motion, bifurcated the hearing to decide the motion into two separate Article 39(a), UCMJ, 10 U.S.C. § 839(a), sessions. A summary of each session follows.

**1. First Session—Appellant's Threshold Burden**

At the first session, the military judge received evidence on Appellant's burden of persuasion to show that "some evidence" of UCI exists.[8] On this issue, Brig Gen Niemi was the sole witness called to testify on the accusatory aspect of Appellant's claim for relief.[9] No sworn statements were received from Lt Gen Cotton despite his role as the GCMCA who referred the charges and convened the court-martial.

After the close of evidence, and during oral argument on the motion, Appellant particularized the undue influence he believed tainted Brig Gen Niemi's preferral decision. Appellant did not give unique reasons why he believed Lt Gen Cotton's referral decision was similarly tainted. However, the gravamen of Appellant's argument repeated the claim in his written motion that trial by court-martial was a "foregone conclusion."[10] For support, trial defense counsel drew the military judge's attention to an email the AETC SJA sent to Lt Gen Kwast's executive officer that Appellant attached to his motion. Referring to Appellant's stance that the intervention by senior leaders within AETC made trial by court-martial inevitable, trial defense counsel argued the email showed,

---

[8] *See generally United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013).

[9] The Government called witnesses to address Appellant's claims of UCI in the adjudicatory phase of his court-martial.

[10] Trial defense counsel explained, "The most acute example of unlawful command influence in this case . . . comes from [Appellant] being sent here TDY to Maxwell Air Force Base under the foregone conclusion that he would be court-martialed."

> That was the expectation from the beginning. Now, you will, in fact, see an email from the AETC Staff Judge Advocate where he says the words, "We should think about sending Captain Butler to a more neutral appearing general officer." Not a more neutral general officer, but a more neutral appearing general officer. The fact that Captain Butler was going to be court-martialed was a foregone conclusion.

There is little doubt from the record that trial defense counsel's reference to a "neutral appearing general officer" meant Lt Gen Cotton, and the Government has made no claim to the contrary either at trial or in this appeal.[11] Although Appellant had similarly claimed in his written motion that Lt Gen Cotton's referral decision was a "foregone conclusion," and that UCI played a role in that decision, the military judge did not address Appellant's claim that UCI tainted Lt Gen Cotton's referral decision: in the same way the Government's brief was silent on this matter, the military judge made no findings of fact or conclusions of law on Appellant's claim as regards UCI affecting referral.

The military judge did find that Appellant met his burden to show some evidence of UCI "as it relates to the transfer of this case from one convening authority, namely 19th Air Force, to the convening authority at Air University."[12] Notably, the military judge also found some evidence of UCI in Brig Gen Niemi's decision to prefer charges.

### 2. Second Session—The Government's Burden

In the second session of the hearing to resolve whether Appellant was entitled to relief on his motion, the military judge heard argument from counsel for both parties on the issue of the Government's burden of persuasion. How-

---

[11] The following provides context to this conclusion: before the decision was made to transfer Appellant's case to Lt Gen Cotton at Air University, the SJA for AETC emailed Lt Gen Kwast's executive officer, recommending, "[W]e should get any Convening Authority action to a more neutral-appearing G.O. [General Officer]." The SJA further recommended that "we also consider AU/CC [Lt Gen Cotton] for command action. We have a very robust legal team [at Maxwell AFB] and the messaging of moving to a three-star commander from a 2-Star could avoid some unintended and unfair speculation on the part of those that may care to comment and be heard."

[12] This finding was announced from the bench, which prompted trial counsel to ask, "I believe the Court found that the burden has shifted on actual and apparent accusatory UCI with respect to the transfer of this case from one [GCMCA] to another essentially . . . ." The military judge acknowledged this was "correct," but his written ruling was silent whether Appellant had shown some evidence of UCI in the *transfer*.

9

ever, the Government presented no evidence in that session, informing the military judge and Appellant that the information it wanted the court to consider in regard to its burden was the testimony Brig Gen Niemi had given in the first session along with the attachments to both Appellant's written motion and the Government's written opposition.

In the end, the military judge denied Appellant's motion, ruling that the Government had met its burden of proof beyond a reasonable doubt "that actual and apparent UCI do not exist surrounding the transfer of the case to the new preferral authority."[13] Additionally, the military judge concluded that no actual or apparent UCI had tainted Brig Gen Niemi's decision to prefer charges. Conspicuously, the focus of the ruling was the military judge's determination that "Brig Gen Niemi was simply not influenced by the statements or actions of any other authority."[14] The ruling was again silent as to whether UCI played a part in Lt Gen Cotton's decision to refer the charges and convene the court-martial.

The military judge concluded, also, "that any objective, disinterested observer, who was present for the testimony of Brig Gen Niemi and was therefore fully informed of all the facts and circumstances, would not harbor any doubt about the fairness of this court-martial." Among the military judge's essential conclusions was that "the Government has proven beyond a reasonable doubt that Brig Gen Niemi was not influenced by the actions or statements of" Lt Gen Kwast "or anyone else when coming to his decision to prefer charges in this case."

After a bench trial, Appellant was found guilty of the two specifications under review, and acquitted of seven others.

## II. DISCUSSION

### A. Law

The United States Court of Appeals for the Armed Forces (CAAF) "has long recognized that Article 37(a)[, UCMJ, 10 U.S.C. § 837(a),] prohibits unlawful influence by all persons subject to the UCMJ." *United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)). To this end, a recommendation for trial by court-martial must be reached independent of unlawful influence by a superior commander. *United*

---

[13] On this point, the military judge announced his ruling from the bench, but his written ruling was again silent about actual or apparent UCI affecting the transfer.

[14] This opinion makes minor corrections to typographical issues in the ruling without alteration.

*States v. Davis*, 37 M.J. 152, 155–56 (C.M.A. 1993) (appellant's immediate commander was not unlawfully influenced by the brigade commander to dispose of offenses by court-martial). When "coercion influence[s] the preferral of charges," the CAAF has regarded "such charges as 'unsigned and unsworn.'" *United States v. Weasler*, 43 M.J. 15, 18 (C.A.A.F. 1995) (quoting *United States v. Hamilton*, 41 M.J. 32, 36 (CMA 1994)).

"The term 'unlawful command influence' has been used broadly . . . to cover a multitude of situations in which superiors have unlawfully controlled the actions of subordinates in the exercise of their duties under the UCMJ." *Hamilton*, 41 M.J. at 36 (citing *United States v. Hawthorne*, 22 C.M.R. 83 (C.M.A. 1956)). And yet, "the plain language of Article 37(a), UMCJ, does not require intentional action." *Barry*, 78 M.J. at 78 (finding actual command influence). In this regard, the CAAF has avowed that "an 'improper manipulation of the criminal justice process,' even if effectuated unintentionally, will not be countenanced by this [c]ourt." *Id.* (quoting *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017) (finding appearance of UCI)); *see also United States v. Rosser*, 6 M.J. 267, 273 n.19 (C.M.A. 1979) ("[T]he fact that the system appears vulnerable to command pressures may be as damaging as the occasional exercise of such pressures. Individuals react to phenomena, after all, on the basis of their perceptions of those phenomena." (quoting H. Moyer, *Justice and the Military*, § 3-400 (1972))).

When an allegation of UCI is litigated at trial, the military judge's findings of fact are reviewed for clear error. *United States v. Johnson*, 54 M.J. 32, 34 (C.A.A.F. 2000). As a result, an appellate court is bound by the military judge's factfinding absent clear error. *Barry*, 78 M.J. at 78 (citing *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999)). This means an appellate court must "accept as true the military judge's findings of fact on a motion to dismiss for unlawful command influence unless those findings are clearly erroneous." *United States v. Proctor*, ___ M.J. ___, No. 20-0340, 2021 CAAF LEXIS 509, at *12 (C.A.A.F. 2 Jun. 2021) (citing *United States v. Stirewalt*, 60 M.J. 297, 300 (C.A.A.F. 2004)). A military judge also abuses his factfinding discretion when "he fails to consider important facts." *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (citation omitted).

An appellate court must "review de novo the legal question whether those facts constitute unlawful command influence." *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F. 2000) (citing *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994)); *see also Barry*, 78 M.J. at 77; *United States v. Salyer*, 72 M.J. 415, 423–24 (C.A.A.F. 2013) (reviewing "lower court's analysis, reasoning, and conclusion regarding the appearance of unlawful command influence" de novo).

"Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful

command influence." *Boyce*, 76 M.J. at 247. Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In order to demonstrate actual UCI, the appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999)). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)).

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Id.* (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)).

Unlike actual UCI, a meritorious claim of an appearance of UCI does not require prejudice to an accused. *Boyce*, 76 M.J. at 248. As with actual UCI, "when an appellant asserts there was an appearance of unlawful command influence[,] [t]he appellant initially must show 'some evidence' that unlawful command influence occurred." *Id.* at 249 (footnote omitted) (quoting *Stoneman*, 57 M.J. at 41) (additional citation omitted).

"Once an appellant presents 'some evidence' of unlawful command influence, the burden then shifts to the [G]overnment to. . . . prov[e] beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence." *Id.* (quoting *Salyer*, 72 M.J. at 423) (additional citation omitted). If the Government fails to rebut the appellant's factual showing, it may still prevail against a claim of apparent UCI if it proves "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding.'" *Id.* at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423). "Deciding whether some evidence of unlawful command influence created an intolerable strain on the public's perception of the military justice system is a fact-intensive inquiry." *Proctor*, 2021 CAAF LEXIS 509, at *23.

When the Government fails to meet its burden to rebut an appellant's threshold showing of actual or apparent UCI, as a matter of law an appellant has, therefore, established UCI affecting the findings or sentence. *United States v. Riesbeck*, 77 M.J. 154, 166 (C.A.A.F. 2018) (citations omitted).

## B. Military Judge's Ruling Denying Appellant's UCI Motion

Although Appellant's claim of accusatory UCI is relatively straightforward, a full development of events leading to the preferral of charges is necessary to resolve the issue. At trial, the military judge made findings of fact and conclusions of law to deny Appellant's claim that actual and apparent UCI tainted Brig Gen Niemi's preferral decision and the fairness of his court-martial. These findings and conclusions are addressed in turn along with the information of record that bears on the military judge's ruling.

### 1. Findings of Fact

The following findings of fact[15] have support in the record and are relevant to whether Appellant and the Government satisfied their respective burdens of proof as to the issue of actual and apparent UCI affecting Brig Gen Niemi's decision to prefer charges and the fairness of the judicial proceedings. Where indicated, the military judge's findings are supplemented with information from the record that was available to the military judge when he ruled on Appellant's motion.

#### a. The Letter of Admonishment and Verbal Counseling

Two incidents are central to the resolution of Appellant's UCI claims and this appeal. Appellant's squadron commander at Laughlin AFB took administrative action for these incidents, and Appellant would subsequently be charged and convicted of separate offenses for both.

The first and most significant of the two incidents happened on 17 November 2017 after Appellant made a phone call to PB[16] when Appellant was at home and in an extremely emotional state.[17] Out of concern for Appellant, PB decided to conduct a welfare check and drove to Appellant's home, entered, and searched for Appellant. Before long, Appellant discovered PB in his home, drew

---

[15] Except where indicated, the footnotes in this background section provide context, and are not among the findings that the military judge identified in his written ruling.

[16] During the relevant period, PB was a company-grade officer and an instructor pilot like Appellant. They worked and socialized off-duty with PB's wife and others.

[17] Appellant had consumed a significant amount of alcohol and manifested depressive and suicidal ideation during the phone call.

a loaded handgun, and pointed it at PB, whereupon PB dove for cover behind a couch and asked Appellant to put down the weapon. Appellant complied at the same time that PB lunged toward, struck, and disarmed Appellant.[18] After the incident, PB took it upon himself to remove all the firearms he could find in Appellant's home.

For this incident, and consistent with the advice he received from the wing SJA, on 25 January 2018 Appellant's squadron commander administered an LOA, which rebuked Appellant for his abuse of alcohol.[19] Appellant would later be charged and found guilty of committing an aggravated assault upon PB by pointing a dangerous weapon at him, a loaded firearm, in violation of Article 128, UCMJ. In his ruling, the military judge found Appellant had self-reported mental health concerns the day after the incident and was admitted for inpatient evaluation. As evident from the record, for this incident Appellant was suspended from flying duties for failure to meet aeromedical standards, and was ineligible for a medical waiver to return to flying status for at least six months.

The second incident happened on 10 May 2018 after Appellant, along with three other members of his squadron, were consuming alcohol in the squadron heritage room. Appellant became intoxicated and walked into his squadron commander's office.[20] Appellant's behavior prompted his commander to ask Appellant to leave. Encouraged by other members of the squadron, Appellant left the office and, eventually, the building. Early the next week, Appellant's commander verbally counseled him for his behavior. For this incident, Appellant would later be charged and found guilty of drunk and disorderly conduct to the prejudice of good order and discipline, in violation of Article 134, UCMJ.

### b. Senior Officer Inquiries

Later in the same week as the verbal counseling, Appellant's squadron

---

[18] PB did not initially report that a firearm had been involved in the affray at Appellant's home. On 28 November 2017, security forces (SF) personnel opened an investigation after PB revealed in late November that Appellant drew a firearm. That investigation determined Appellant was intoxicated and upset about his divorce. PB entered Appellant's home, which was unlocked, without invitation. After Appellant drew and pointed a loaded gun at PB in the living room, Appellant said to him, "[S]o you are afraid to die," or maybe, "There are things you are scared of," before holstering the weapon. The SF investigation was closed in late December 2017.

[19] The LOA referenced "an altercation allegedly ensued involving a handgun" and admonished Appellant for his "conduct while intoxicated by alcohol."

[20] Information in the record lends support to the conclusion that Appellant's intent was to confront his commander about his treatment for the last six months while he awaited a decision on a medical waiver and return to flying status.

commander nonetheless recommended his return to flying status. His commander concluded that Appellant had complied with measures put in place after the incident with PB in Appellant's home and, as found by the military judge, Appellant's squadron commander believed he "had demonstrated a demeanor compatible with instructor flight duties."

In the summer of 2018, as a decision on the medical waiver was pending, Appellant was suspected of other alcohol-related incidents that would call into question his suitability to return to duty as an instructor pilot. His behavior would prompt scrutiny by Maj Gen Doherty not only in regard to Appellant's conduct, but what the chain of command at Laughlin AFB knew, reported, and did about it. As the numbered air force commander over Laughlin AFB, Maj Gen Doherty's holistic concern reached beyond discipline to Appellant's well-being, fitness for duty, and the safety of personnel at the base.

In July 2018, Appellant inflicted a deep cut to his hand from a glass while consuming alcohol. The injury required immediate medical attention to stop the bleeding and stitches. Three days later, Appellant arrived drunk at a gathering of squadron personnel and their spouses at a local winery. Appellant reportedly made unwelcome sexual comments to a military member's spouse and engaged in flirtatious behavior at the event. Due to his behavior, members of Appellant's unit escorted him home. One member remained with Appellant overnight because Appellant was emotionally unstable and possibly suicidal.

Reports of these alleged incidents and others reached Maj Gen Doherty who grew dissatisfied with the responses provided by his command team at the base. On 9 August 2018, Appellant was the focus of two teleconferences led by Maj Gen Doherty. The first was held with the colonel who commanded the wing. The second included members of the Laughlin AFB command team and supporting agencies that had been looking after Appellant and addressing his medical and other issues. As found by the military judge, Maj Gen Doherty criticized their reaction to Appellant's alcohol-related incidents:

> During the call, the 19 AF/CC[, Maj Gen Doherty,] was clearly agitated and expressed dissatisfaction with the actions taken by the command team . . . in addressing the alleged misconduct of [Appellant] and protecting the installation and those who worked and lived on it. Throughout the teleconference the 19 AF/CC took a very directive posture with those in attendance . . . . The second teleconference ended with the 19 AF/CC directing that a plan be develop[ed] to address [Appellant]'s situation and to remove his access to firearms, his ability to consume alcohol, an alcohol treatment program referral, and other actions as appropriate.

The next day, Maj Gen Doherty held another teleconference with the Laughlin AFB leadership team.[21] He again expressed "dissatisfaction with the[ir] handling of [Appellant] and began to interrogate members present about whether [Appellant] posed a safety risk." After the meeting, Appellant was issued orders that restricted him to base and led to the seizure of his weapons. Appellant was also given an order not to consume alcohol.

### c. Investigations Leading to Disposition and Transfer

Two investigations of Appellant's conduct were initiated in the fall of 2018. One was a base-level commander-directed investigation (CDI) that was conducted between 13 and 28 August 2018. This CDI substantiated other alleged misconduct not previously addressed by Appellant's command, and, as a result, the wing commander recommended Maj Gen Doherty offer Appellant nonjudicial punishment (NJP) under Article 15, UCMJ, 10 U.S.C. § 815. Initially, Maj Gen Doherty supported this recommendation and directed NJP be prepared for his signature. Subsequently, Maj Gen Doherty would transfer the case, and NJP was ultimately not offered to Appellant by Maj Gen Doherty or another commander.[22]

The military judge did not make findings of fact in regard to the allegations included in the draft NJP action that was prepared but not offered to Appellant. Conspicuously, none of the allegations in the draft NJP action addressed the firearm incident with PB in Appellant's home—the same incident for which Appellant received an LOA (and would later be charged and convicted of aggravated assault at court-martial). Instead, the allegations addressed the incident on 10 May 2018 in the squadron commander's office that had initially been resolved by verbal counseling—the same incident for which Appellant would subsequently be charged and convicted of drunk and disorderly conduct. For this incident, as drawn up in the draft NJP, it was alleged that Appellant was disrespectful to a superior commissioned officer in violation of Article 89,

---

[21] The wing commander, Appellant's squadron commander, and other individuals involved in either the treatment or investigation of Appellant attended the meeting. Legal personnel from the base and some of Maj Gen Doherty's staff also attended.

[22] Maj Gen Doherty did not discipline Appellant under Article 15, UCMJ, 10 U.S.C. § 815, for the incidents substantiated by the CDI because he had misgivings whether NJP was the appropriate forum. On 4 September 2018, and again on 6 September 2018 (when Lt Gen Kwast and Maj Gen Doherty were visiting Laughlin AFB), the wing commander was about to serve the NJP action on behalf of Maj Gen Doherty, and the plan was aborted at Maj Gen Doherty's direction. Each time, Appellant was prepared to be served by the wing commander and was directed to return to his duty location.

UCMJ, 10 U.S.C. § 889. The remaining draft NJP allegations accused Appellant of bringing firearms into his workplace in violation of Article 92, UCMJ, 10 U.S.C. § 892; that he was drunk to the prejudice of good order and discipline sometime in July 2018 in violation of Article 134, UCMJ; and that he was drunk and disorderly at the winery in violation of Article 134, UCMJ.[23] In the end, none of the alleged drunk and disorderly incidents in the summer of 2018, or any other incidents that summer, were among the offenses that were preferred or referred to trial by court-martial.[24]

A second investigation was initiated by the Air Force Office of Special Investigations (AFOSI) in late August or early October 2018.[25] That investigation was prompted by AFOSI agents who reviewed a base-level security forces investigation of Appellant, and determined it was inadequate from an investigatory standpoint.

The most significant investigation that bears on Appellant's UCI motion was directed by the commander of AETC. On 10 September 2018, Lt Gen Kwast initiated a commander-directed investigation (AETC CDI) to look into the causes and circumstances of recent officer misconduct at Laughlin AFB.[26] Although not addressed in the military judge's ruling, the AETC CDI included a favorable evaluation of the wing SJA's recommendation that Appellant's squadron commander administer Appellant an LOA for the firearm incident on 17 November 2017, when Appellant pointed a loaded handgun at PB in Appellant's home.

Also unaddressed in the ruling was that the AETC CDI team had obtained what it termed "an independent evaluation" from a judge advocate in the grade

---

[23] The Laughlin AFB wing commander identified the allegations somewhat differently in an email he sent to Maj Gen Doherty, but those differences are not material.

[24] The only offense Appellant was charged at court-martial with committing in 2018 was a specification that alleged Appellant was drunk and disorderly in his commander's office on 10 May 2018 in violation of Article 134, UCMJ, 10 U.S.C. § 934.

[25] The memorandum Maj Gen Doherty signed transferring Appellant's case to Air University stated the investigation was conducted between 6 and 27 September 2018.

[26] Lt Gen Kwast and Maj Gen Doherty paid an official visit to Laughlin AFB on 6 September 2018. In a session with base leaders, Lt Gen Kwast announced he would initiate a commander-directed investigation (CDI), which subsequently began on 10 September 2018. According to the executive summary, the AETC CDI looked into "the causes and circumstances of recent officer misconduct [at the wing] . . . to include: the organization and training culture; leadership environment and oversight . . .; barriers to reporting by students and instructors; and institutional policies and safeguards."

of lieutenant colonel who had "both staff judge advocate and extensive criminal trial experience." That legal evaluation concluded that an LOA "was reasonable for the conduct" underlying the firearm incident.[27] That evaluation considered three potential UCMJ offenses: assault, disorderly conduct, and conduct unbecoming an officer.[28] The following is the analysis and conclusion from the report, which cast doubt about the evidentiary sufficiency of these potential violations of the UCMJ:

> Considering assault, an act of force of violence is unlawful if done without legal justification. It was lawful for Captain [Butler] to carry a firearm in his own residence and to draw it in the face of an unexpected intruder. He had no duty to retreat and did holster the weapon after identifying the intruder. Under these facts, assault most likely could not be proven.
>
> . . . .
>
> As to disorderly conduct (drunk and disorderly), the government could prove that [Captain Butler] was drunk, but would face difficulty in proving he was disorderly and the conduct was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces. There is no legal prohibition against being drunk in your own home as long as you are not infringing upon the rights and privacy of others. Further, as stated above, Captain [Butler]'s actions were legal; in [sic] that he drew a legally possessed firearm in his home in the face of a potential intruder and then holstered it after identifying the intruder. Further, even after the intruder physically attacked him, he did not take any actions to defend himself.
>
> Finally, in proving Captain [Butler]'s conduct was "conduct unbecoming" as defined in the UCMJ, the government would need to show that the conduct was an action or behavior in an unofficial or private capacity which in dishonoring or disgracing the

---

[27] The independent legal evaluation concluded a letter of reprimand would also have been reasonable under the circumstances. Footnotes in the block quotes from the AETC commander-directed investigation have been omitted from this opinion.

[28] The legal evaluation also addressed the offense of communicating a threat. As background, three days after the incident in Appellant's home, Appellant allegedly called PB's wife and told her that he would have killed PB, and the only reason she still had a husband was because Appellant cared about her and her children. The legal evaluation concluded the statement failed to "express a present determination or intent to wrongfully injure presently or in the future," and so it did not communicate a threat.

officer personally, seriously compromised his standing as an officer. By law there are certain moral attributes common to the ideal officer and perfect gentleman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, or cruelty. While Captain [Butler]'s overall character is questionable, his conduct in his own home . . . does not meet this definition.

On this point, the AETC CDI concluded,

Given the above analysis, it was reasonable for the legal office [at Laughlin AFB] to recommend that the incident be addressed through an administrative actions [sic] such as an LOA or [letter of reprimand]. Again, these tools could be used to improve, correct, and instruct regarding a departure from standards of performance, conduct, bearing, and integrity, on or off duty, and whose actions degrade the individual and unit's mission. Captain [Butler] may have acted lawfully, but his binge drinking and handling of loaded firearms while intoxicated were unwise and risked both his personal safety and his ability to perform the mission.

Among other conclusions, the AETC CDI also determined that there were potential concerns in the direct involvement and directive nature taken by Maj Gen Doherty's handling of Appellant's case. The AETC CDI was critical of Maj Gen Doherty's actions,[29] observing what the report described as "the tone, tenor and repeated clash of positions" between The Nineteenth Air Force and its wing at Laughlin AFB. The AETC CDI team observed, "Should [Appellant] face court-martial as a result of the current investigation, the CDI team recommends all decisions regarding his case be removed" from The Nineteenth Air Force and the wing at Laughlin AFB.

Although the military judge did not make a finding about when the AETC CDI was completed, evidence in the record is clear that, before it concluded,

---

[29] The report was critical of Maj Gen Doherty's "direction" to the wing in regard to Appellant's commander-directed mental health examination, the restriction of Appellant to the installation with 24/7 monitoring, and an order that prohibited Appellant from consuming alcohol off-duty. The report concluded that Maj Gen Doherty "did not have the right to order a junior commander to take these actions," but stopped short of finding these actions, motivated by health and safety concerns, were unlawful. The significance of this conclusion is not that it was correct, but that it had some bearing on the decision to transfer Appellant's case.

Maj Gen Doherty, with the advice of his command's SJA, sought to move Appellant to a command that reported to a different convening authority in AETC. The military judge found that the desire to transfer Appellant's case was out of concern for Maj Gen Doherty's involvement and to ensure there was no perception of UCI.

The military judge made no findings about the substance of communications between Maj Gen Doherty and Lt Gen Kwast that preceded the transfer other than "[o]n 25 September 2018, 19 AF/CC requested AETC/CC move the accused's case to another AETC convening authority." The communication relied on by the military judge appears to have been an email[30] Maj Gen Doherty sent to Lt Gen Kwast. The email shows Lt Gen Kwast was aware Maj Gen Doherty held an unfavorable opinion of the leadership team he had in place at Laughlin AFB and that Maj Gen Doherty believed Appellant's chain of command had taken a dismissive approach to Appellant's conduct. Maj Gen Doherty informed his superior,

> [T]he team at Laughlin is aware of my concern for their lack of engagement, judgment, and inaction when I became aware in August of [Appellant]'s more recent misconduct in July and *minimizing the known misconduct over a 9 month period* since Nov[ember] 2017. Team Laughlin is also mindful of your investigation into them, as well as the fact that my oversight of their leadership is also scrutinized.

(Emphasis added).

In that same email, Maj Gen Doherty informed Lt Gen Kwast of the progress of the AFOSI investigation and that judge advocates who would be called upon to give advice would likely recommend trial by court-martial should charges be preferred:

> [T]he OSI investigation into [Appellant]'s misconduct is close to complete. There are several very serious offenses [AF]OSI has uncovered during their investigation and we anticipate that a court-martial will be the recommendation from the JA team.[31]
>
> . . . .

---

[30] The email was attached to Appellant's motion, and was not referenced in the military judge's ruling.

[31] The scope of the "JA team" is not clear from the email, but it suggests Maj Gen Doherty was predicting what the advice on disposition would be from what he had been told about the gravity of the offenses under investigation by the AFOSI.

> As we have recently discussed, my legal team and I have been significantly involved in . . . monitoring the status of the case . . . .
>
> Further, because the team at Laughlin is so invested in the outcome of this case, I also recommend that should charges be preferred, an officer outside of [Appellant]'s current command chain should take such action.

Maj Gen Doherty explained "it would be wise" to remove Appellant's case from The Nineteenth Air Force, and further recommended to his superior that "another AETC convening authority *and legal team* take [Appellant's] case . . . to ensure this case is free from taint." (Emphasis added). He further offered his legal "team is prepared to work with" Lt Gen Kwast's SJA and the AETC legal "team to ensure a smooth handoff."

Maj Gen Doherty also elaborated at some length that an outside observer might question his and his SJA's impartiality, although he was confident he could fairly dispose of any charges. With regard to his concern that his SJA's impartiality could be questioned, Maj Gen Doherty explained his SJA is "probably 'too close' to this case and the perception of objectivity could be questioned by defense counsel with regards to legal advice to a convening authority." At the same time, Maj Gen Doherty drew a direct connection between leadership failures and the disposition of Appellant's case. He explained in the same email,

> While I am confident that the current [AETC] CDI does not influence any decision I would make on disposition of this case and that my engagement has not caused me to pre-judge any facts, there are too many arguments that a savvy defense counsel could make that would distract attention from the case against [Appellant] and could jeopardize any potential conviction, should the evidence prove his guilt beyond a reasonable doubt. My objective is to minimize any avoidable legal issue *that the leadership problems of Laughlin have created in the disposition of this case* and to ensure this case is not only fair, but also perceived as fair by anyone who is familiar with the circumstances.

(Emphasis added).

### *d. Transfer of the Case*

As found by the military judge, on 11 October 2018 Maj Gen Doherty sought to transfer Appellant's case to Lt Gen Cotton at Air University, and he did so to avoid the perception that UCI tainted Appellant's case. The transfer memo

cited Rule for Courts-Martial (R.C.M.) 601(g)[32] as authority and was addressed to Lt Gen Cotton at Air University. Although the military judge did not reference the memo in his ruling, it was included in the evidence that Appellant attached to his written motion.

The memo asked Lt Gen Cotton to "accept transfer of *U.S. v. Butler* as a parallel General Court-Martial Convening Authority." The memo explained that the AFOSI investigation, which had concluded on 27 September 2018, had examined "allegations of communicating a threat, assault with a firearm, abusive sexual contact,[33] and assault." It further informed that "[t]he past misconduct of [Appellant] was the catalyst for an informal inquiry into the communication within the chain of command at Laughlin AFB, which was directed by [Maj Gen Doherty], and a subsequent [CDI] directed by the AETC/CC." Lt Gen Cotton accepted the transfer in an undated indorsement. As found by the military judge, Lt Gen Cotton then transferred the case to his subordinate, Brig Gen Niemi, who commanded the Holm Center.

### e. Events Preceding Preferral of Charges

The military judge credited Brig Gen Niemi's testimony on the motion, including what he knew about Appellant's case and Lt Gen Cotton's expectations. The military judge found, "This Court notes that it had the ability to observe the testimony of Brig Gen Niemi and found him very credible. He answered questions of all counsel and the Court candidly and without hesitation."

Brig Gen Niemi testified he had no knowledge of Appellant or any allegations when he learned Appellant was to be transferred to his unit. All he was told was that Appellant would be sent for temporary duty (TDY) at the Holm Center "while judicial proceedings played out." He explained, "The only thing that I recall was all [passed] through the [SJA at the Holm Center],[34] and that was [Appellant] would be TDY to the Holm Center, and that would be *for an indefinite period of time while proceedings would play out*," (emphasis added), although he denied being informed that the duration of Appellant's TDY was

---

[32] R.C.M. 601 contains rules for referral of charges against an accused. R.C.M. 601(g) states, "*Parallel convening authorities*. If it is impracticable for the original convening authority to continue exercising authority over the charges, the convening authority may cause the charges, even if referred, to be transmitted to a parallel convening authority. This transmittal must be in writing. . . ."

[33] As noted at the beginning of this opinion, Appellant was not charged with any offense in violation of Article 120, UCMJ, 10 U.S.C. § 920.

[34] Brig Gen Niemi was TDY when he learned from the Holm Center's deputy commander "that we had an individual, Captain Butler, who would be TDY to the Holm Center *for an extended period of time*." (Emphasis added).

indefinite.

Because Brig Gen Niemi had not been told what would be required of him as Appellant's commander or what Appellant's duties were to be, he testified that he reached out to his superior officer, Lt Gen Cotton, for guidance. His superior told him he was "responsible for taking a look at whatever evidence you have got and make a *recommendation,*" (emphasis added), on what action to take, which could include preferral of charges. On this point, the military judge found that Brig Gen Niemi "was not provided a recommendation on whether preferral was expected or even supported by the evidence, and [he] was under the full impression that he was to exercise his independent discretion in coming to a determination of whether or not to prefer charges."

At the same time Brig Gen Niemi personally reached out to his superior to clarify his role, the Air University SJA broached this subject in an email he sent to Lt Gen Cotton, informing him that Brig Gen Niemi was "under the impression that you pulled all of [Appellant's] case to your level, including the initial charging."[35] Lt Gen Cotton replied by email, "He may have gotten that from me. [Brig] Gen Niemi asked if he had any actions and I said no[,] it's me and [Lt Gen] Kwast. I told him I was the [Article] 32 appointment official. My mistake. Please correct everyone to 100%." Brig Gen Niemi's SJA, who was copied on the email, forwarded the clarification in an email she sent to Brig Gen Niemi, explaining that "Lt Gen Cotton confirm[ed] his expectation that preferral remain with the Holm Center," and that "Lt Gen Cotton will continue to act as the referral authority as the GCMCA."

About the same time as this exchange of emails, on 23 or 24 October 2018 Appellant arrived at Maxwell AFB. As evident from the record, Appellant's orders authorized him to perform temporary duty at the Holm Center for 167 days with an estimated cost that surpassed $21,000.00. In line with Brig Gen

---

[35] The SJA's email continued,

> I don't believe this is correct since if you sign the initial charging, then [Lt] Gen Kwast would be required to appoint the [Article] 32[, UCMJ, preliminary hearing] officer, pick members, refer the case, etc.[ ] The way this was originally discussed is that a Holm Center commander would make the initial charging decision, and then you would appoint the [Article] 32[, UCMJ, preliminary hearing officer], refer the case, pick members, etc.

The military judge's ruling did not address the Air University SJA's email or the exchange that followed.

Niemi's testimony that he "was provided almost no information as to the reason [for] or length of the TDY," the military judge made no findings about Appellant's orders, notably, why Appellant's TDY was necessary, or the reason for its length.[36]

About one week before Brig Gen Niemi preferred the charges on 6 November 2018, he attended a video conference with the other general officers in AETC that was chaired by Lt Gen Kwast. As found by the military judge, the video conference was held on 30 October 2018, and it was the forum in which Brig Gen Niemi learned that Lt Gen Kwast had relieved Appellant's wing, group, and squadron commanders at Laughlin AFB. Through Brig Gen Niemi's testimony, the military judge found,

> At that teleconference, [Lt Gen Kwast] announced that he had relieved a number of commanders from [Laughlin AFB], to include the [wing commander]. Very few details were given as to why such a significant action was taken. The comments of [Lt Gen Kwast] indicated to Brig Gen Niemi that the commanders who had been relieved had failed to take adequate action to fulfil their responsibility to the people under their charge and at Laughlin AFB.

The ruling explained that Lt Gen Kwast's video conference "was probably the day before . . . the removal was announced for the wing commander, group commander, and squadron commander at Laughlin [AFB]." Brig Gen Niemi "recall[ed] there were very few details given in the teleconference to explain why [Lt Gen Kwast] had made such a significant decision for removing those

---

[36] The military judge's ruling did not attach any significance to the TDY that was favorable to Appellant's UCI motion, at the same time acknowledging that Appellant did attach significance to the TDY and transfer of disposition authority:

> The Defense also asserts that the act of sending the accused TDY to Maxwell AFB pending the disposition of his case constitutes both actual and apparent unlawful command influence in the accusatory phase. The Defense asserts that in ordering the accused TDY, [Lt Gen Kwast] was making clear that "nothing short of a court-martial" would be sufficient.

Even so, the ruling did not address Appellant's claim. Instead, the military judge drew conclusions from Appellant's TDY that favored the Government's burden on the motion, finding that Brig Gen Niemi "was provided almost no information as to the reason or length of the TDY" as support for the conclusion that "he was intentionally isolated from the facts of the case to ensure that he could act independently."

commanders," and that the part of "the discussion about the firing[s] at Laughlin [AFB] was no more than 15 minutes." Brig Gen Niemi also recalled that Lt Gen Kwast's comments focused on "his assessment that the commanders at Laughlin [AFB] didn't fulfill the responsibility to the people there at Laughlin [AFB], and he talked about standards, and he talked about making sure that people were in a safe environment."

Brig Gen Niemi testified he was uncertain precisely when he read the report of investigation (ROI), but he recalled that he relied on its "detail[ing] the allegations against [Appellant] for pointing a loaded firearm at people," as a reason why he directed "certain precautions [to] be taken" before Appellant arrived at Maxwell AFB. He testified, "It was around this time that [he] read the ROI, which is where [he] got almost all of [his] information" about Appellant's case.[37]

Importantly, as found by the military judge, Brig Gen Niemi "was able to put together the facts from [Lt Gen Kwast's] teleconference and made the connection that potentially part of the reason for the relief of command by [Lt Gen Kwast] might have involved [Appellant]." On this point, Brig Gen Niemi testified he "read the ROI first, and then when [he] became aware of the fact that the commanders at Laughlin [AFB] were going to be fired is when [he] realized that the two were related."

Notably, the ROI informed that Appellant's squadron commander had served Appellant an LOA for the firearm incident involving PB in Appellant's home on 17 November 2017. The following exchange explains the revelation that Appellant's case was related to Lt Gen Kwast's decision to relieve the commanders:

> Q [Trial Counsel]. At this point, having received the ROI, and now having sat in on this teleconference, at that point did the two things kind of click together in your mind regarding the packet that you had been given?
>
> A [Brig Gen Niemi]. It clicked after I read the ROI.
>
> Q. Okay. The subject matter of the ROI was the same subject

---

[37] Brig Gen Niemi similarly attributed his knowledge of Appellant's allegations to the ROI, testifying "[t]hat was the only document that I had, and that formed the basis for my knowledge almost in the entirety." Three investigative reports were attached to Brig Gen Niemi's forwarding memorandum to Lt Gen Cotton on 6 November 2018. That memorandum stated "[t]he Air Force Office of Special Investigations report of investigation and other evidence is attached and supports the charges." Both the base-level CDI and security forces investigation of Appellant were attached as evidence.

matter as this teleconference?

A. Yes.

That same day of the relief of the three commanders for cause, AETC published a news release explaining that Lt Gen Kwast had "determined the command team did not take appropriate actions to respond to, correct and report incidents of officer misconduct" at the base.[38] Lt Gen Kwast communicated his expectation that "[u]ltimately, every commander is responsible for enforcing good order and discipline and holding those accountable who do not live up to the professionalism we expect of our Airmen." The military judge did not identify that he relied on the contents of the news release or otherwise reference it in his ruling.

However, the ruling did reference that before Brig Gen Niemi preferred charges, on 1 November 2018 Lt Gen Kwast's public affairs office at AETC "posted a video on Facebook that explained [Lt Gen Kwast]'s reasons for relieving members of the command team at Laughlin AFB." Like the news release that attributed the firings to mishandling of incidents of *officer misconduct*, the video focused generally on the commanders' failure take "sufficient" action in response to "behavior in their wing, in their group, [and] in their squadron." The video was played in its entirety at the motions hearing. Lt Gen Kwast delivered this message:

> Thank you Air Education and Training Command for giving me a minute of your day. I want to inform you that I am relieving the wing commander of Laughlin Air Force Base, and the operations group commander, and one of the squadron commanders, and his director of operations. And the reason I am doing this is

---

[38] Quoting Lt Gen Kwast's observations and expectations, the news release continued:

> The prior command team chronically failed to appropriately care for people and the mission . . . . They failed to correct an evolving situation that led to an environment where some Airmen did not feel safe or respected. . . . By failing to address incidents of dangerous behavior and a threatening environment, irresponsible alcohol consumption, and disrespectful treatment of some students, these leaders did not establish and enforce a culture that upheld our Air Force core values . . . . The command team at Laughlin was not leading a healthy culture of accountability, dignity and respect. . . . All Airmen who come to work for this Air Force should feel respected, protected and connected with their teammates and their mission . . . . As the commander of AETC, I take this responsibility seriously and I want our Airmen to know their leaders will be held accountable for failing to enforce a safe and professional environment.

because I have seen over time a pattern of behavior that is inconsistent with our values. These commanders saw behavior in their wing, in their group, in their squadron that they knew was inconsistent with our values, *and they did nothing sufficient about it*, and it continued. And that behavior created a culture where the Airmen there did not feel safe, and they did not feel respected, and it became a cancer that caused problems. This is an important lesson for all of us. No matter your job in this Air Force, no matter your job in this command, when you see something that is behavior inconsistent with our values then you do something about it. You say something about it, and you do not walk by. Because if you walk by, it becomes acceptable to anybody that sees you as a leader walking by a situation that is not right.

So, we also need to be forgiving. These commanders are good people, *but they did not live up to our expectations of commanders, and we will hold them accountable*. This is part of the art of war in a profession of arms, that we live our lives differently where we must live them above reproach and hold ourselves and our clients to these high standards of behavior consistent with the respect and dignity of every Airmen we serve.

Thank you for serving this great country, and *thank you for holding each other accountable* to behavior above reproach.

(Emphasis added).

The military judge found that "Brig Gen Niemi saw this video on the day it was released." The ruling continued:

In the video, [Lt Gen Kwast] states that he had seen a pattern of behavior inconsistent with the core values and that those who were relieved had seen behavior that they also knew was inconsistent with the core values *but failed to take adequate action to address*. This created an unsatisfactory environment where members at Laughlin AFB did not feel safe or respected. He closed by saying that those who had been relieved were "good people" but that they failed to live up to the expectations of commanders and must be held accountable.

(Emphasis added).

### f. Preferral of Charges

Brig Gen Niemi preferred charges on 6 November 2018, about one week after he learned why Lt Gen Kwast relieved Appellant's chain of command at

Laughlin AFB. He testified:

> The only thing that I received that was the entire body of evidence that I used to make the decision was the ROI. I had no access to any other information or any other individuals. So, I read the ROI multiple times. I consulted with the judge advocate in the Holm Center to help me determine what would be appropriate based on what my judgment was from the ROI, and that is how we proceeded.

As found by the military judge:

> Brig Gen Niemi fully reviewed the draft charges and specifications provided to him by his legal office, the ROI which contained the evidence upon which he based his decision, and consulted with his legal advisor. Of note, Brig Gen Niemi did not fully concur with the charges and specifications that were placed before [him] and recommended that a specification be removed as he felt it was not supported by the evidence. In coming to his decision, Brig Gen Niemi testified that he felt he had full authority to either prefer or not prefer some or all of the charges and specifications before him. He also stated that if he had not chosen to prefer any charges or specifications that he assumed the matter would simply be returned to the referral authority for some other action. Brig Gen Niemi was steadfast in his belief that he had full authority and discretion to make an independent decision based upon the evidence before him.

Sometime after preferral, Brig Gen Niemi recommended to deny Appellant's request to resign in lieu of trial by court-martial (RILO). However, the military judge made no findings on this matter. Brig Gen Niemi testified he "was balancing what was likely to happen if the case went forward in a court-martial with the benefit to the Air Force, and the benefit with regard to transparency, and making sure that there was no appearance that things were being swept [under] the rug." He elaborated that one of the factors he considered in recommending denial of the RILO request was the importance of transparency after the significant focus, both outside and within the Air Force, on the relief of the three commanders at Laughlin AFB:

> Q [Circuit Defense Counsel]. How did the relief from command of the three commanders that were relieved, how did that play into your sort of decision process regarding transparency and the RILO?
>
> A [Brig Gen Niemi]. Not at all.

Q. Okay. So, did you believe that it was important for this -- for there to be sort of a transparent court process, because whatever this was, it resulted in the relief of three commanders?

A. I believed it was important for -- the transparency was important because it is always important to bolster trust in our system. But in this case, there was a significant amount of media attention and focus on it and curiosity, both inside the Air Force and outside the Air Force.

Q. And that is one of the reasons why a court-martial was appropriate, was because of things like that?

A. This was one of my considerations that I weighed.

On 28 November 2018, Lt Gen Cotton referred the recommended charges to trial by general court-martial.

### 2. Conclusions of Law

In addition to his findings of fact, the military judge reached several conclusions of law[39] to deny Appellant's claim of UCI affecting the accusatory phase of the court-martial.

First among these conclusions was that Appellant met his threshold burden of demonstrating that there was some evidence of UCI both in the transfer[40] of the case and Brig Gen Niemi's decision to prefer charges. In particular, the military judge found Appellant produced some evidence of facts which, if true, would constitute UCI and that it had "a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings." The military judge reached this conclusion because of evidence that "Brig Gen Niemi had made the connection between the firings and public statements of the AETC/CC and [Appellant]'s case prior to making a decision on whether or not to prefer charges to a court-martial and that this overrode the independent decision of Brig Gen Niemi in this case." The military judge also found Appellant met his burden in proving some evidence that the same facts, if true, "would place an intolerable strain on the public's perception of military justice such that an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor significant doubt about the fairness of the proceeding."

---

[39] Where indicated, these conclusions include the testimony on which they are based.

[40] As discussed earlier, the conclusion that some evidence of UCI affected the transfer of the case was a ruling from the bench.

The military judge relied on Brig Gen Niemi's testimony to reach the conclusion that he was not unlawfully influenced. He testified that Lt Gen Kwast's statements in the teleconference and Facebook video did not influence his decision to prefer charges. He believed he exercised his independent judgment in making that decision. He acknowledged understanding that it was his authority and his alone to make a determination as to whether or not to prefer charges. To that end, he denied anyone told him that a court-martial was the only appropriate disposition. He understood his "authority was to read the evidence in the ROI, since that was the only evidence [he] had, and then make a recommendation to [Lt ]Gen[ ]Cotton regarding whether or not to prefer charges based on the evidence in the ROI." Brig Gen Niemi later acknowledged that before preferring charges and "reading the ROI, [his] knowledge of th[e] case *consisted only of what [he] had been told by [his] servicing [SJA], [his] legal office.*" (Emphasis added). He did not think he received legal advice from any other legal office, but he "kn[e]w that there were some discussions with the [Air University] Judge Advocate . . . to make sure that [he] understood what the sequence of events was, and what the options were that were available to [him] from a legal proceeding perspective."

The military judge asked, "[D]id you have the option not to prefer charges when those options came to you?" Brig Gen Niemi answered, "I don't -- I believe that I had that option, but no one talked to me about that specifically." He explained, "[his] thought process, or what [he] recall[ed] was, it was [his] responsibility to read the ROI and then, in consultation with the judge advocate, to make a judgment and a recommendation based on whether the ROI indicated that charges should be preferred." The military judge then asked, "Okay. And then you would prefer or not prefer based upon that assessment you made?" Brig Gen Niemi replied, "Yes, that is correct," which later prompted this exchange:

> Q [Military Judge]. And what was your understanding of the sequence of events?
>
> A [Brig Gen Niemi]. Now, my understanding was that it was my responsibility to read the ROI, decide if charges were appropriate, and then prefer them if they were appropriate.
>
> Q. Okay. And then it basically was handed off out of your hands, as you had mentioned earlier to me, to [Lt ]Gen[ ]Cotton, correct?
>
> A. That is correct.

Additionally, Brig Gen Niemi testified he did not perceive any adverse action might be taken against him in the event he did not prefer charges. He explained he "did not go forward with all of the charges that were recommended to [him] from the judge advocate from the Holm Center. There was at

least one that [he] elected not to *recommend*" (emphasis added) and did not prefer. Consistent with this testimony, the military judge found "Brig Gen Niemi did not equivocate when he stated that the fact that the command chain at Laughlin AFB had been relieved from command played absolutely no role in his decision to prefer charges. Brig Gen Niemi further stated he feared no adverse action based upon his decision and knew that his decision to prefer charges would simply be forwarded to the referral authority for a decision on whether referral to a court-martial was appropriate in this case."

Relying heavily, if not entirely, on the testimony of Brig Gen Niemi, the military judge concluded the Government met its burden to disprove UCI beyond a reasonable doubt. Specifically, the military judge found "the Government has proven beyond a reasonable doubt that Brig Gen Niemi was not influenced by the actions or statements of AETC/CC or anyone else when coming to his decision to prefer charges in this case." The military judge found "Brig Gen Niemi had the perceived and actual authority to exercise his full discretion as he saw fit as a commander in coming to this decision."

To reach this conclusion, the ruling credited Brig Gen Niemi's testimony on the motion:

> Brig Gen Niemi was intentionally isolated from the facts of the case to ensure that he could act independently. While Brig Gen Niemi testified that he did make the connection between the firings of [Appellant]'s chain of command at Laughlin AFB, he also testified that those actions and the statements of the AETC/CC *did not impact his decision in the slightest*. Brig Gen Niemi candidly explained that he based his decision off the report of investigation that he was provided as evidence of the alleged offenses. Brig Gen Niemi also clearly stated that he even disagreed as to the preferral of one of the specifications recommended by his legal advisor and directed the specification be removed from the charge sheet prior to preferral. Again, the Court found Brig Gen Niemi was candid and open in answer[ing] all questions from counsel and the Court in regard to his decision making process and was steadfast in his assertion that he exercised full discretion in determining whether or not to prefer charges in this case based upon his review and understanding of the evidence.

(Emphasis added).

Turning then to the allegation that Lt Gen Kwast's actions constituted apparent UCI affecting preferral, the military judge again found that the Government met its burden, relying once more on Brig Gen Niemi's testimony. The military judge concluded "that any objective, disinterested observer, *who was*

*present for the testimony of Brig Gen Niemi and was therefore fully informed of all the facts and circumstances*, would not harbor any doubt about the fairness of this court-martial." (Emphasis added).

## C. Analysis

At trial, Appellant claimed actual and apparent UCI tainted the accusatory phase of the court-martial. Although a focus of his pretrial motion was the pressure he believed Brig Gen Niemi was under to prefer charges, he also asserted in that motion that referral was a foregone conclusion because circumstantial evidence supports the idea that UCI played a role in Lt Gen Cotton's decision to refer the case to trial by general court-martial. During oral argument on the motion, Appellant again asserted his court-martial was a foregone conclusion when he was sent on TDY to a unit at Maxwell AFB that was commanded by a brigadier general who reported through a superior to Lt Gen Kwast.

On appeal, Appellant maintains his claims of accusatory UCI, asserting that Brig Gen Niemi and Lt Gen Cotton had both "[b]ecome [t]ainted" and they "had no discretion to consider any other disposition of [Appellant]'s case but to prefer and refer charges," respectively. Among Appellant's claims as to the sources of pressure that had an undue influence on these general officers were the external and internal statements Lt Gen Kwast made after he relieved Appellant's wing, group, and squadron commanders six days before charges were preferred. Lt Gen Kwast was openly critical of the leaders at Laughlin AFB, believing their responses to officer misconduct in their units and other decisions were misguided or incorrect.

### 1. Referral of Charges

We begin, in brief, with Appellant's challenge against Lt Gen Cotton and his decision to refer the charges in this case. Considering Appellant's arguments in his pretrial motion and at the hearing on that motion, his objection to the UCI that he believed influenced Lt Gen Cotton's referral decision "was sufficiently clear that the Government was 'not deprived of the opportunity to respond.'" *United States v. Bavender*, 80 M.J. 433, 440 (C.A.A.F. 2021) (Maggs, J., concurring in part and in the judgment) (quoting *United States v. Blackburn*, 80 M.J. 205, 210 (C.A.A.F. 2020)); *see also United States v. Rich*, 79 M.J. 472, 475 (C.A.A.F. 2020) ("While there are no 'magic words' dictating when a party has sufficiently raised an error to preserve it for appeal, of critical importance is the specificity with which counsel makes the basis for his position known to the military judge."). Thus, we find Appellant did not fail to develop or preserve a claim that UCI played a role in Lt Gen Cotton's decision to refer the case to trial by general court-martial. *See Hamilton*, 41 M.J. at 37 (holding

defects in the preferral or forwarding of charges are waived, if they are not first raised at trial).

Still, the military judge made no findings of fact or conclusions of law on Appellant's claim that Lt Gen Cotton's decision was unduly influenced by Lt Gen Kwast in the same way as Brig Gen Niemi's role as accuser. This was error. As a rule, once some evidence of UCI is raised, "a military judge must determine the facts and then decide whether those facts constitute unlawful command influence." *Stoneman*, 57 M.J. at 42 n.2. This error is manifest where both general officers took action in the accusatory phase of the court-martial and the record indicates they could be vulnerable to similar influence from a common source at the same time and under what appear to be nearly identical circumstances.[41] A disinterested member of the public could conclude that Lt Gen Cotton and Brig Gen Niemi were similarly vulnerable to undue influence. "[D]isposition of an issue of unlawful command influence falls short if it 'fails to take into consideration the concern of Congress and this Court in eliminating even the appearance of unlawful command influence at courts-martial.'" *Stoneman*, 57 M.J. at 42 (quoting *Rosser*, 6 M.J. at 271).

Because the military judge erred by failing to rule on a case dispositive claim in Appellant's motion, the first instinct is to remand to cure the record. *See United States v. Barry*, 76 M.J. 407 (C.A.A.F. 2017) (granting petition for reconsideration and directing convening authority to order a factfinding hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967)); *see also United States v. Jacinto*, ___ M.J. ___, No. 20-0359, 2021 CAAF LEXIS 686, at *12 (C.A.A.F. 15 Jul. 2021) (remanding for further factual development of the record when the court "cannot make an informed decision about whether the military judge's crucial factual findings are clearly erroneous").

To be sure, remand would allow a military judge to conduct a factfinding hearing and rule on the question of whether Appellant raised some evidence which, if true, would constitute actual or apparent UCI in Lt Gen Cotton's referral decision. *Stoneman*, 57 M.J. at 43 (concluding that a hearing before a military judge is necessary to resolve appellant's UCI claim). Remand would also allow the Government to reopen its case on the UCI motion to present

---

[41] No direct evidence establishes Lt Gen Cotton attended the weekly general officer teleconference in which Lt Gen Kwast announced the relief of the commanders at the base, but "the facts that are known are sufficient to establish a prima facie case that goes beyond mere allegation or speculation." *United States v. Proctor*, ___ M.J. ___, No. 20-0340, 2021 CAAF LEXIS 509, at *15 (C.A.A.F. 2 Jun. 2021). Notably, Lt Gen Kwast cast a wide net in his internal and external messaging to ensure every Airman in AETC knew the actions he took and the reason. On this record, a commanding general would have been no less informed than rank and file Airmen in his command.

evidence on its various burdens in the event that a military judge would conclude that Appellant met his initial burden of UCI affecting referral. But even if remand for further development of the record was appropriate, we find it unnecessary under the circumstances here, as explained next.

**2. Preferral of Charges**

Whether or not Appellant is correct in his challenge against Lt Gen Cotton, the question of whether there was UCI affecting referral will become moot if there was actual or apparent UCI affecting preferral. We find there was both.

Except where indicated in the following analysis, we accord deference to the military judge's findings of fact and include them along with this court's own factfinding[42] in our de novo analysis. *Cf. Salyer*, 72 M.J. at 429 (Ryan, J., dissenting) ("[T]he majority effectively ignores the military judge's findings of fact and suggests, without explicitly holding, that the Government's actions in this case amounted to an unlawful effort to unseat a military judge.").

The military judge reached two conclusions of law on Appellant's claim of accusatory UCI affecting preferral that are most pertinent to this court's decision. As to the first, the military judge did not abuse his discretion in concluding that Appellant met his burden of showing some evidence to support his claim of UCI in both the transfer of the case and Brig Gen Niemi's decision to prefer charges. The military judge found support for this conclusion in his finding that Brig Gen Niemi made the connection that Appellant's case was related to Lt Gen Kwast's decision to relieve Appellant's chain of command.

As to the second conclusion, the military judge did not err when he shifted the burden to the Government to prove beyond a reasonable doubt that there was either no UCI or that it did not affect preferral. *See Boyce*, 76 M.J. at 249. The military judge, also, did not err when he shifted the burden to the Government, in the alternative, to prove beyond a reasonable doubt that UCI did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding. *See id.* at 249–50.

However, we find the Government failed to prove beyond a reasonable

---

[42] *See*, *e.g.*, *United States v. Cendejas*, 62 M.J. 334, 342 (C.A.A.F. 2006) ("Unlike most intermediate appellate courts and [the CAAF], the Court of Criminal Appeals has factfinding powers." (citing Article 66(c), UCMJ, 10 U.S.C. § 866(c)).

doubt that "the facts as presented do not constitute unlawful command influence." *Boyce*, 76 M.J. at 249 (citing *Salyer*, 72 M.J. at 423) (additional citation omitted). The Government also failed to prove "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding.'" *Id.* at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423).

Central to these conclusions are the timing and context of Lt Gen Kwast's actions and statements, and the military judge's finding that Brig Gen Niemi made the connection that Appellant's case was related to Lt Gen Kwast's decision to relieve Appellant's chain of command. We turn, then, to examine these circumstances.

### a. Lt Gen Kwast's Actions and Statements

At the outset, the record does not yield reasons to question the motives of senior leaders who intervened at Laughlin AFB and sought to resolve Appellant's issues and problems at the wing. *See Salyer*, 72 M.J. at 428 ("Whether the Government's primary motive was to remove a properly detailed military judge from the case through inappropriate means or not, it had that effect."). Likewise, "[n]o showing of knowledge or intent on the part of government actors is required in order for an appellant to successfully demonstrate that an appearance of unlawful command influence arose in a specific case." *Boyce*, 76 M.J. at 251 (citing *Biagase*, 50 M.J. at 151) ("In cases involving unlawful command influence, the key to our analysis is effect—not knowledge or intent."). Ultimately, what matters is the effect of actions and statements of these leaders, and not their intentions. The focus is influence, not intent.[43]

The dilemma of extra-judicial statements of commanders, and how they may influence subordinates charged with responsibilities under the UCMJ, is a predicament at least as old as the UCMJ. *United States v. Littrice*, 13 C.M.R. 43, 52 (C.M.A. 1953) (finding that "[t]he attempt to enlighten the court members may have been prompted by the highest ideals but" was command coercion nonetheless); *see also United States v. Flegel*, 17 C.M.R. 710, 719 (A.F.B.R. 1954) ("The matter of command influence and the delicate adjustment of that factor in military justice was of foremost concern to the Congress and was a prime motivating factor in the revamping of military criminal law accomplished by the 81st Congress and embodied in the Uniform Code of Military

---

[43] On this point, we take note of Maj Gen Doherty's email to Lt Gen Kwast: "My objective is to minimize any avoidable legal issue that the leadership problems of Laughlin have created in the disposition of [Appellant's] case and to ensure this case is not only fair, but also perceived as fair by anyone who is familiar with the circumstances."

Justice."). At the start of this century, the CAAF observed that "military leaders, who exercise both prosecutorial and judicial functions in the military justice process," are expected "to exercise due care in developing and executing communications plans when potential military justice actions are pending." *United States v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003).

In *Littrice*, the United States Court of Military Appeals (CMA), the predecessor to the CAAF, first recognized "the necessity of maintaining a *delicate balance* between justice and discipline."[44] *Littrice*, 13 C.M.R. at 47 (emphasis added). In that case, the court determined extra-judicial statements unduly influenced the court members, concluding that "[t]he accused was convicted and sentenced by a court-martial which was not free from external influences tending to disturb the exercise of a deliberate and unbiased judgment." 13 C.M.R. at 52. The CAAF similarly observed that extra-judicial public comments about a pending criminal matter may be "perilous" and "pose a grave risk to the goal of ensuring that justice is done in every case." *United States v. Bergdahl*, 80 M.J. 230, 238 (C.A.A.F. 2020). This is "[b]ecause of their capacity to influence decision makers in a court-martial." *Id.*; *see also id.* at 247 (Sparks, J., concurring in part and dissenting in part) ("Preserving the inherent fairness of the military justice process by shielding it from outside influence continues as one of this Court's highest responsibilities.").

In the case under review, the dispositive issue is whether the statements made by, or attributable to, Lt Gen Kwast, in context, "fall within the fair limits permitted by the Manual [for Courts-Martial] or were they of such a coercive nature that there was a violation of the Code restriction against the exercise of improper influence" *Littrice*, 13 C.M.R. at 48. Lt Gen Kwast's remarks did not specifically mention Appellant or his case; but, the reason he gave for relieving Appellant's chain of command was because they had failed to take adequate and sufficient action to address officer misconduct like Appellant's. To be sure, Lt Gen Kwast's message reached beyond officer discipline, "indicat[ing] to Brig Gen Niemi that the commanders who had been relieved had failed to take adequate action to fulfil their responsibility to the people under their charge," as found by the military judge. However, an unmistakable cause of their failures—according to an AETC news release—was that Lt Gen Kwast had "determined the command team did not take appropriate actions to re-

---

[44] "The same delicate balance which beset Congress now confronts us. Justice can be dispensed and discipline maintained if one is not permitted to overwhelm the other. Both should be given recognition and both must be governed and guided by the necessities peculiar to the military service." *United States v. Littrice*, 13 C.M.R. 43, 48 (C.M.A. 1953); *see also Rosser*, 6 M.J. at 272 (recognizing the "'delicate balance' that must be maintained between military justice and command discipline").

spond to, correct and report incidents of officer misconduct" at the base. Undeniably, Appellant was among this group of officers, and Brig Gen Niemi made that connection. The consequence of their failures—according to Lt Gen Kwast's Facebook video—was that "they did not live up to our expectations of commanders, and we will hold them accountable."

In this regard, Lt Gen Kwast's remarks are analogous to the statements that were found coercive in *United States v. Youngblood*, where, in the opinion of a staff judge advocate, a commander had "underreacted" and "shirked his or her leadership responsibilities." 47 M.J. 338, 340 (C.A.A.F. 1997); *see id.* at 342 (holding it was "asking too much" of court members "to expect them to impartially adjudge an appropriate sentence without regard for its potential impact on their careers" after they heard the "Commanding General's views of the career potential of a commander who had 'underreacted' to a disciplinary situation").

The timing of the remarks is especially revealing because they were made when Brig Gen Niemi's preferral decision was imminent. *See Bergdahl*, 80 M.J. at 236 (finding the late Senator John McCain's public threat to hold a hearing "while Appellant's case was pending a referral decision" was "some evidence" of an appearance of UCI because it had the potential to appear to "coerce" or "influence" the outcome). Importantly, Brig Gen Niemi made the connection between the relief of Appellant's commanders and Appellant's case. To this end, the Government appropriately concedes on appeal, "While Brig Gen [Niemi] was reviewing the ROI in Appellant's case, he deduced that the commanders' removal from command may have been due in part to their handling of Appellant's case."

Like the remarks found coercive in *Youngblood*, Lt Gen Kwast's remarks made six days before preferral were "recent and fresh in the minds" of the subordinate officers like Brig Gen Niemi who heard them. 47 M.J. at 342. Considering the military judge's finding that Brig Gen Niemi "made the connection that potentially part of the reason for the relief of command by [Lt Gen Kwast] might have involved [Appellant]," Lt Gen Kwast's remarks are similar to *Youngblood* in another important respect: the clear import was that the "career potential of a commander who had 'underreacted' to a disciplinary situation . . . was not hypothetical but was specific and reinforced by a recent example." *Id.* As it happens, the recent example in the case under review was specific to the officers who were formerly in Appellant's chain of command. Lt Gen Kwast's public message was that commanders at the base had failed to take adequate and sufficient action in response to officer misconduct. Brig Gen Niemi was aware that Appellant was among this group of officers when he preferred charges. A reasonable person could conclude that it was Lt Gen

Kwast's determination of inadequate and insufficient disciplinary action in regards to Appellant and other officers that led him to relieve Appellant's wing, group, and squadron commanders.

### b. Brig Gen Niemi's Testimony

The military judge erred in his determination that the Government met its burden of proving beyond a reasonable doubt that there was no actual or apparent UCI in this case. We reach this conclusion chiefly because the military judge abused his discretion in crediting Brig Gen Niemi's testimony, concluding as he did "that any objective, disinterested observer, who was present for the testimony of Brig Gen Niemi and was therefore fully informed of all the facts and circumstances, would not harbor any doubt about the fairness of this court-martial." Among the bases for the military judge's conclusion was his determination that "Brig Gen Niemi was simply not influenced by the statements or actions of any other authority" and that Brig Gen Niemi "had the perceived and actual authority to exercise his full discretion as he saw fit as a commander in coming to th[e] decision" to prefer charges.

Ordinarily, conclusions such as these would be entitled to deference, founded as they are "upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *United States v. Harrington*, 81 M.J. 184, 191 (C.A.A.F. 2021) (quoting *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020)). To be sure, the demeanor of a witness "is critical to evaluate whether there is an objective appearance of unfairness" in resolving claims of UCI. *Stoneman*, 57 M.J. at 42. Nonetheless, "[m]ilitary law has traditionally viewed such perfunctory statements from subordinates on the effects of command influence as inherently suspect, not because of the credibility of the witness but because of the difficulty of the subordinates in ascertaining for himself [sic] the effect of any attempted command influence." *Rosser*, 6 M.J. at 272; *see also United States v. Rodriguez*, 16 M.J. 740, 742–43 (A.F.C.M.R. 1983).

At the same time, the military judge's conclusion that Brig Gen Niemi was not influenced in his preferral decision is not a question of fact that an appellate court reviews for clear error that is deferential to the factfinder. Rather, it is a question of law that the CAAF has long held is subject to de novo review. *Stirewalt*, 60 M.J. at 300 ("The question of command influence flowing from [a military judge's findings of fact] is a question of law that we review de novo." (footnote omitted)); *Johnson*, 54 M.J. at 34; *see also Wallace*, 39 M.J. at 286.

In the ruling under review, the military judge's conclusion that the Government met its burden is directly tied for support on the determination that Brig Gen Niemi's testimony demonstrated he was essentially immune to influence. Consequently, this court reviews de novo whether Brig Gen Niemi's tes-

timony, which the military judge's ruling credited and relied upon, was sufficient for the Government to carry its burden. It is in this light that the court evaluates whether the Government proved beyond a reasonable doubt that there was no actual UCI, that there was no intolerable strain upon the public's perception of the military justice system, and that an objective, disinterested observer, who is fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding.

We find *United States v. Boyce* instructive in this determination. In *Boyce*, the convening authority, Lt Gen Franklin, had come under "great public scrutiny" and garnered the attention of the Secretary of the Air Force (SECAF) after he used his clemency authority to disapprove findings of guilty in an aggravated sexual assault case, and declined to refer charges of sexual assault in another. 76 M.J. at 244–46. The same day Lt Gen Franklin received the appellant's referral package, which included allegations of sexual assault, the Chief of Staff of the Air Force (CSAF) informed him that the SECAF had lost confidence in him and that he had two options: retire at the lower grade of major general or wait for the SECAF to remove him from command. *Id.* at 245–46. Subsequently, Lt Gen Franklin announced his retirement two days after he referred charges against the appellant. *Id.* at 246. At trial, the Government responded to allegations of UCI with an affidavit from Lt Gen Franklin that unequivocally disavowed influence in any way from outside pressure. *Id.* Relying on Lt Gen Franklin's attestation that he decided to refer the case "independently,"[45] the military judge found neither UCI nor the appearance of UCI beyond a reasonable doubt, concluding that Lt Gen Franklin "may be the most bombproof of any convening authority out there simply because of . . . his retirement, and the fact that he has, on occasion, seemingly gone against the interests of others in the military." *Id.* However, the CAAF disagreed with the military judge, observing his conclusion that Lt Gen Franklin was "bombproof," and thus immune to unlawful influence, was a legal conclusion rather than a factual finding. *Id.* at 250 (though a "close question," military judge's determination that Lt Gen Franklin was "bombproof" was a legal conclusion rather than a factual finding, and thus reviewed de novo). Ultimately, the CAAF "adopt[ed] Lt Gen Franklin's words as [the Court's] own: '[It] would be foolish to say there is no appearance of UCI,'" and held that a member of the public would question whether the SECAF and CSAF "improperly inhibited

---

[45] Lt Gen Franklin averred: "'Any comments by superior government officials, both civilian and military, had absolutely no impact on my decision-making as a convening authority,' and 'I did not and would not allow improper outside influence to impact my independent and impartial decisions as a GCMCA.'" *United States v. Boyce*, 76 M.J. 242, 246 (C.A.A.F. 2017).

Lt Gen Franklin from exercising his court-martial convening authority in a truly independent and impartial manner." *Id.* at 252–53.

In his trial testimony, Brig Gen Niemi appeared steadfast in his belief that he was beyond influence much as Lt Gen Franklin averred was the case in *Boyce*. As found by the military judge, Lt Gen Kwast's statements did not impact Brig Gen Niemi's preferral decision "in the slightest," in the same way as the military judge in *Boyce* credited Lt Gen Franklin's testimony that he was "bombproof." And yet, in the same way that the CAAF concluded in *Boyce* that "an objective disinterested observer would not agree that Lt Gen Franklin had nothing to gain or lose," *id.* at 251, Brig Gen Niemi was no less immune to influence than Lt Gen Franklin, especially because during the relevant periods, the arc of Brig Gen Niemi's military career was undoubtedly positive and Lt Gen Franklin's was decidedly in decline.[46] Brig Gen Niemi would have been no less aware than any other officer subordinate to Lt Gen Kwast—and similarly aware as Lt Gen Franklin was in *Boyce*—that his preferral decision was "being scrutinized by his superiors *and* about the potential personal consequences of 'ignoring political pressure . . . .'" *Id.* (concluding "Lt Gen Franklin was no more 'bombproof' than any other GCMCA").

To be sure, this case is not identical to *Boyce*. Brig Gen Niemi's testimony, unlike Lt Gen Franklin's affidavit, did not "acknowledge[ ] the existence of many of the essential facets of a valid claim of an appearance of unlawful command influence." *Boyce*, 76 M.J. at 251. However, Brig Gen Niemi's testimony did give reason to question his apparent independence and invulnerability to influence, which the military judge abused his discretion by failing to evaluate in his ruling.

First, Brig Gen Niemi's testimony raises reasonable doubt that he came to the decision to prefer charges solely in reliance on the ROI and the independent advice of a judge advocate. Although he disavowed apprehension of personal repercussions if he did not prefer charges, at the same time he allowed "a significant amount of media attention and focus" on the firings, "both inside the Air Force and outside the Air Force," was a consideration when he later recommended denial of Appellant's RILO submission—as were considerations of "transparency" and "to bolster trust in our system." The media attention that existed at the time Brig Gen Niemi made his RILO recommendation had its

---

[46] The SECAF's loss of confidence in Lt Gen Franklin was hardly inconsequential. Lt Gen Franklin retired in the grade of major general. *See* CRAIG A. FRANKLIN, https://en.wikipedia.org/wiki/Craig_A._Franklin (last visited 20 Aug. 2021); *see also* Nancy Montgomery, *Franklin Will Retire as a Two-Star, Officials Say*, STARS AND STRIPES (10 Jan. 2014), https://www.stripes.com/news/franklin-will-retire-as-a-two-star-officials-say-1.261202 (last visited 20 Aug. 2021).

origin in Lt Gen Kwast's Facebook video and AETC news release, both of which occurred before Lt Gen Niemi preferred charges. It stands to reason that Brig Gen Niemi would have given no less weight to these external considerations when he preferred the charges as he did later when he disfavored the RILO. In fact, he appeared to testify as much: in response to a question that was put to him by Appellant's counsel, he acknowledged one of the reasons why a court-martial was appropriate (as compared to the RILO) was the attention that had already been given to Appellant's case both inside and outside the Air Force as well as the attendant importance to bolster trust in the system. Such considerations evoke an observation made by the CAAF about the motivations of the convening authority in *United States v. Barry* who was "concerned about the impact to the Navy if [he] were to disapprove . . . findings" of sexual assault[47] following conversations the convening authority had with Navy officials. 78 M.J. 70, 78, 79 (C.A.A.F. 2018) (concluding that actual unlawful influence tainted the appellant's case).

Second, the military judge's ruling did not sufficiently evaluate the manner by which Appellant was transferred to Air University and then attached to the Holm Center. Brig Gen Niemi was given "almost no information as to the reason [for] or length of [Appellant's] TDY." The only details he did receive had been "passed to [him] through the [SJA] at the Holm Center, and they were that an individual was going to be transferred to the Holm Center *while judicial proceedings played out*." (Emphasis added). The record is similarly barren of the details of that transfer. At the same time, an unmistakable implication from the duration and cost of Appellant's TDY—directed by an order that authorized 167 days of travel that exceeded $21,000.00—is a disposition by preferral of charges and trial by court-martial. The clear implication to the gaining commander under these circumstances is that a judicial proceeding was the appropriate disposition from the vantage of persons who authorized, or were instructed to authorize, Appellant's travel. The circumstances of Appellant's transfer for judicial proceedings without Brig Gen Niemi's request or authorization also reflects that determination. The Government presented no evidence to disprove that those involved in Appellant's transfer to Air University intended anything other than a court-martial, as might have been given by persons with personal knowledge of why Appellant had been sent to the Holm

---

[47] "Even though I believed then, and I believe now, that I should have disapproved the findings, my consideration of the Navy's interest in avoiding the perception that military leaders were sweeping sexual assaults under the rug . . . affected my decision of whether to approve or disapprove the findings or sentence in this case." *United States v. Barry*, 78 M.J. 70, 78 (C.A.A.F. 2018).

Center for judicial proceedings to play out when Brig Gen Niemi had not yet evaluated the evidence to make that determination.

The military judge also abused his discretion in two other respects as his findings bear on the Government's burden of proof. First, he made no findings whether Brig Gen Niemi received legal advice independent of the same influence that the military judge determined was some evidence of UCI in the transfer of the case and Brig Gen Niemi's decision to prefer charges.[48] *Cf. United States v. Johnston*, 39 M.J. 242, 245 (C.M.A. 1994) (concluding "[t]he general court-martial convening authority acted independently with the advice of his own staff judge advocate"). The only details Brig Gen Niemi did receive about Appellant's transfer were from his SJA, and yet the record is barren of what his SJA may have been informed and by whom. What is known from Brig Gen Niemi's testimony is that Appellant was removed from Laughlin AFB so that judicial proceedings would play out. At the same time, Maj Gen Doherty informed Lt Gen Kwast that his command's SJA was "probably 'too close' to this case and the perception of objectivity could be questioned." However, as might be expected, judge advocates at various echelons of command within AETC, including the AETC SJA who reported to Lt Gen Kwast, appeared to have been actively involved in the handoff of Appellant's case. Tellingly, (a) Maj Gen Doherty relayed to his superior at AETC that "we anticipate that a court-martial will be the recommendation *from the JA team*" (emphasis added); (b) he further offered that his legal "team is prepared to work with" Lt Gen Kwast's SJA and the AETC legal "team to ensure a smooth handoff;" (c) the transfer memo from Maj Gen Doherty to Lt Gen Cotton already identified Appellant's case in the style of a judicial proceeding, "*U.S. v. Butler*;" and (d) the memo cited R.C.M. 601(g), which provides guidance on the transmittal of charges that have already been preferred or referred. Ordinarily, a reviewing court will "presume that the legal officers properly performed their professional duties which include[ ] independent review of the evidence and preparation of only those charges for which they determine[ ] probable cause exist[s]." *United States v Ashby*, 68 M.J. 108 (C.A.A.F. 2009). Here, the military judge made no finding why the Government might rely on this presumption when the military

---

[48] In this appeal, the Government suggests "[n]o allegation has been made, or evidence presented, to suggest that . . . [the Air University's pretrial advice to Lt Gen Cotton, which included a] legal recommendation was impacted by UCI." However, as to the legal advice that preceded preferral and other decisions, Appellant's trial motion put forth Appellant's broad claim that the AETC SJA's "e-mail and advice [to Lt Gen Kwast's executive officer] make clear the command's trajectory for Capt Butler, even though the investigation was still ongoing." In addition, Appellant argued in that motion that "[i]ssues of unlawful command influence, rising to the highest levels of not only the services' commands, *but of their legal staffs*, remain a current, clear, and present danger to the military justice system." (Emphasis added).

judge found some evidence of UCI in the transfer of Appellant's case to Air University, and judge advocates were involved in the transfer.

Second, and related to this first point, the military judge's ruling did not evaluate whether Brig Gen Niemi understood his independent role as accuser when he relied on the advice he had been given. On appeal, the Government concedes "the evidence reflects that Brig Gen [Niemi] was not sure what his role in the judicial process was." When asked, "[D]id you have the option not to prefer charges when those options came to you?" Brig Gen Niemi answered, "I believe that I had that option, but *no one talked to me about that* specifically." (Emphasis added). He explained, "[his] thought process, or what [he] recall[ed] was, it was [his] responsibility to read the ROI and then, in consultation with the judge advocate, to make a judgment and a *recommendation* based on whether the ROI indicated that charges should be preferred." (Emphasis added). Lt Gen Cotton told Brig Gen Niemi he was "responsible for taking a look at whatever evidence you have got and make a *recommendation.*" (Emphasis added). At the same time, Lt Gen Cotton related he would appoint the Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing officer and that preferral remained with Brig Gen Niemi. The Government did not show that Brig Gen Niemi knew he could consider any lesser disposition, or evaluate matters in extenuation or mitigation about Appellant or the offenses in reaching his decision.[49] As the accuser in this case, Brig Gen Niemi had the sole discretion to bring forth charges or not, and his role was more than advisory. *See e.g.* R.C.M. 306(a) ("A superior competent authority may not limit the discretion of a subordinate commander to act on cases over which authority has not been withheld."). The Government did not demonstrate that any disposition authority had been withheld from Brig Gen Niemi and that he was advised and knew his authority went beyond a decision to prefer or not to prefer charges.

### c. Evaluation of Other Information

Appellant's case is not one where the severity of the offenses and the strength of the Government's evidence would negate the logical connection between Lt Gen Kwast's influence and Brig Gen Niemi's decision to prefer the charges under review. To this end, Appellant's squadron commander did not initiate court-martial proceedings, opting instead to serve administrative actions for the same incidents underlying the findings of guilty. What is more, the independent legal evaluation obtained by the AETC CDI team considered

---

[49] *See, e.g.*, Article 15, UCMJ ("Commanding Officer's non-judicial punishment"); *see also Manual for Courts-Martial, United States* (2016 ed.), pt. V, ¶ 1.d.(1) ("Commanders considering nonjudicial punishment should consider the nature of the offense, the record of the servicemember, the needs for good order and discipline, and the effect of nonjudicial punishment on the servicemember and the servicemember's record.").

the more serious of the two incidents that was charged as aggravated assault with a loaded firearm. The report concluded "[u]nder these facts, assault most likely could not be proven." As a result, the AETC CDI report determined it was reasonable for the SJA at Laughlin AFB to recommend Appellant's squadron commander address this incident by administrative action.

In contrast, in *Boyce*, the CAAF found the appellant was not entitled to relief for his claim of actual UCI because "there is no reasonable likelihood that a different convening authority standing in the shoes of Lt Gen Franklin would have made a different referral decision." *Boyce*, 76 M.J. at 256. However, Appellant's immediate commander at Laughlin AFB did make a different decision than Brig Gen Niemi did, concluding on the advice of the wing SJA that administrative action was reasonable instead of judicial or NJP proceedings. Significantly, this decision was made, and the advice given, before the specter of improper influence by Lt Gen Kwast's extra-judicial statements. Not insignificantly, the judge advocates who evaluated the aggravated assault incident—the wing SJA and the independent legal evaluation obtained by the AETC CDI—stand alone in their advice that disposition by administrative action was reasonable. Unlike preferral, the wing SJA's advice and the independent legal evaluation of that advice occurred before Lt Gen Kwast's public denunciation of Appellant's chain of command and its handling of incidents of misconduct by officers like Appellant. Likewise, the draft NJP action that was prepared for Maj Gen Doherty to serve in September 2018, which also preceded Lt Gen Kwast's statements, did not address the firearm incident in Appellant's home. Unlike the case of the appellant in *Bergdahl*, it cannot be said that every official who was involved in Appellant's case, least of all his squadron commander, had recommended that it "be sent to some type of court-martial." 80 M.J. at 239 (finding the Government satisfied its burden to show there was no appearance of UCI).

Also in *Bergdahl,* the CAAF explained that "it cannot be emphasized strongly enough that [the a]ppellant chose to plead guilty to the offenses of desertion with intent to shirk hazardous duty and misbehavior before the enemy." In that case it followed that "no impartial observer would conclude that it was the comments made by the President of the United States and/or by the chairman of the Senate Armed Services Committee that caused [the a]ppellant to plead guilty." *Id.* at 242. "[R]ather, it was the strength of the Government's evidence that caused [the appellant] to take that step." Here, Appellant pleaded not guilty to the offenses for which his squadron commander had previously served administrative action. It follows that an impartial, disinterested observer would not similarly conclude that Appellant's offenses, as in *Bergdahl*, were likewise severe, or the Government's evidence similarly strong.

Further and related, the strength of the evidence of Appellant's guilt and the gravity of the more serious firearm incident in Appellant's home was not similarly severe as compared to *Bergdahl*. In contrast to the "compelling evidence" presented at the Article 32, UCMJ, hearing in *Bergdahl*, 80 M.J. at 239, here the preliminary hearing officer (PHO) reached no similar conclusion about the quality of the evidence underlying all the preferred charges. Instead, the PHO summarized that "the evidence against the Accused on each charged offense except for Specification 3 of Charge III[50] . . . *meets the very low probable cause standard*" and, therefore, "[t]he totality of the evidence presented to me *meets this low threshold* to support reasonable grounds that the offenses were committed and that the Accused committed them" (emphasis added). Even by one measure of severity—maximum punishment—the cases are not on par. Largely owing to Appellant's aggravated assault conviction, he could be sentenced to confinement for eight years and three months. *Cf. Bergdahl*, 80 M.J. at 239 (compelling evidence presented at an Article 32, UCMJ, hearing that the appellant committed one offense that can be punishable by death and another offense that can be punishable by death depending on whether it was committed during a time of war).

Again in *Bergdahl*, the CAAF considered that "if G[eneral Robert B.] Abrams had chosen to refer [the a]ppellant's case to a special court-martial that was not even empowered to adjudge a bad-conduct discharge, his decision would have been devastating to military morale."[51] *Id.* at 242. Here, the Government points to no evidence of record that morale had suffered when Appellant's commander took administrative actions in lieu of initiating court-martial proceedings, that it would have suffered if Brig Gen Niemi had not preferred

---

[50] The convening authority referred Specification 3 of Charge III without directing changes that the Article 32, UCMJ, preliminary hearing officer recommended. Appellant was found not guilty of Specification 3 of Charge III and six other charged offenses.

[51] The CAAF observed in *United States v. Bergdahl* that if General Abrams had referred charges to a non-BCD special court-martial, then

> members of the armed forces would have realized that G[eneral] Abrams made that referral decision despite the fact that he knew there was over-whelming evidence that Appellant had deserted his post in a combat zone with intent to shirk hazardous duty and had engaged in misbehavior before the enemy, and despite the fact that he knew that other servicemembers were injured or were likely injured in the course of the military's efforts to rescue Appellant from the consequences of his own misconduct.

80 M.J. 230, 242 (C.A.A.F. 2020).

charges, or that morale was somehow preserved because Appellant was tried and convicted. In fact, PB who was the victim of the aggravated assault offense submitted a character letter that was admitted in sentencing, which lends some support to the contrary. He wrote:

> It was never my intention nor desire for [Appellant] to be criminally prosecuted, and[,] in fact[,] I stated to my commander at the time that if I had the choice I would not press charges for the events in November 2017. It is my strong preference to not have to testify against [Appellant] at a court-martial. He needs help and a supportive group of people around him, not a conviction [ ]or to go to jail. I view that either of these two outcomes would only hinder the ability for him to receive the professional care that he deserves.

PB expressed a similar sentiment when he testified at the motions hearing that was held to resolve Appellant's claim of adjudicatory UCI.[52]

Finally, General Abrams, the commander who referred the charges in *Bergdahl*, "stated unequivocally in a sworn affidavit that his decisions in that case were 'not impacted by any outside influence,'" *Bergdahl*, 80 M.J. at 240. Unlike General Abrams, no similar evidence was given by Lt Gen Cotton through testimony or otherwise. To be sure, Brig Gen Niemi, like General Abrams, testified he was not impacted by Lt Gen Kwast's comments in the teleconference and Facebook video, but unlike General Abrams who made it a point to "characterize[ ] the statements made by Senator McCain as 'inappropriate,'" there is no evidence in the record that Brig Gen Niemi made similar remedial statements that might have "demonstrat[ed] a denunciation of and disassociation" from Lt Gen Kwast's comments. *Id.*

A military judge abuses his discretion when "he fails to consider important facts." *Commisso*, 76 M.J. at 321. Here, the military judge did not fully evaluate information in the record that raised reasonable doubt that Brig Gen Niemi came to the decision to prefer charges solely in reliance on the evidence and the independent advice of a judge advocate. At the same time, "[m]ilitary law

---

[52] My dissenting colleague, Judge Meginley, finds "Maj Gen Doherty, whether intentional or not, contributed to an institutional fear in Appellant that potentially tainted witnesses." I respectfully disagree with this conclusion. During testimony on this issue, PB explained he felt pressure to give evidence against his squadron leadership. PB also testified that the information he gave was truthful, and that he did not "add or subtract anything from a statement" because he felt pressure to do so. In this regard, I agree with the conclusion of the military judge that "the Government has me[ ]t its burden beyond a reasonable doubt that there was no unlawful command influence committed by the 19 AF/CC as it pertains to the testimony of PB."

has traditionally viewed . . . perfunctory statements from subordinates on the effects of command influence as inherently suspect." *Rosser*, 6 M.J. at 272. The case under review offers no reason to depart from this view. It follows then, as in *Rosser*, "[t]he military judge's stated reliance on . . . perfunctory statements and his failure to more carefully examine the effect of command influence in this case was error." *Id.* Just as the CAAF found "the military judge's heavy reliance on Lt Gen Franklin's assurances in this case was misplaced," *Boyce*, 76 M.J. at 251, such was the case here.

Viewed through the lens of leadership and discipline, the reasons Lt Gen Kwast gave for relieving the officers in Appellant's chain of command at Laughlin AFB are as unassailable as they are clear. But this court does not judge the timing, circumstances, or the manner by which Lt Gen Kwast took corrective measures and conveyed his expectations and standards to the Airmen under his command. The issue here is not that Lt Gen Kwast found it necessary to ensure discipline in his command. Rather, the question that resolves the appeal is whether, in spite of Lt Gen Kwast's intent, the Government met its burden to demonstrate beyond a reasonable doubt that UCI did not influence Brig Gen Niemi's preferral decision and that no fully informed, disinterested, objective observer would doubt the fairness of Appellant's court-martial. *Boyce*, 76 M.J. at 249–50 (citation omitted). This is the same delicate balance that confronted the Court in *Littrice*.

For the aforementioned reasons, we are not convinced the Government met its burden of proof in our de novo review, much less when we examine the ruling below for an abuse of discretion. We find the influence that Lt Gen Kwast's extra-judicial statements had on Brig Gen Niemi's preferral decision permitted discipline to overwhelm justice. *See Littrice*, 13 C.M.R. at 48. Because the focus is influence as well as its appearance and effect, and not intent, the question must be resolved against the Government. Thus, the findings of guilty and the sentence are set aside for unremediated actual and apparent UCI that tainted Brig Gen Niemi's decision to prefer charges and the fairness of the proceedings below. *See United States v. Lewis*, 63 M.J. 405, 416 (C.A.A.F. 2006) ("Having found that the unlawful command influence in this case has not been cured, we cannot let the findings and sentence stand.").

**D. Remedy**

Having identified unlawful influence by command that affected preferral, the next inquiry is to ascertain if the remedy to which Appellant is entitled should allow the Government to continue the judicial proceedings and initiate a second court-martial. To this end, a reviewing court must remain mindful that "[t]he exercise of command influence tends to deprive servicemembers of their constitutional rights." *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986). "[I]n the military justice system both the right to a trial that is fair, and

the right to a trial that is objectively seen to be fair, have constitutional dimensions sounding in due process." *Boyce*, 76 M.J. at 249 n.8.

"Where [UCI] is found to exist, judicial authorities must take those steps necessary to preserve both the actual and apparent fairness of the criminal proceeding." *Lewis*, 63 M.J. at 407 (citing *United States v. Rivers*, 49 M.J. 434, 443 (C.A.A.F. 1998); *United States v. Sullivan*, 26 M.J. 442, 444 (C.A.A.F. 1988)). An "'appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial.'" *Simpson*, 58 M.J. at 374 (quoting *Stoneman*, 57 M.J. at 42–43); *see also Weasler*, 43 M.J. at 19 (appellate courts are not foreclosed "from stepping in when there are actions by commanders that undermine public confidence in our system of justice or affect the rights of an accused"). "The appearance of the evil of command influence is as much to be avoided as the actual use of such influence." *Rodriguez*, 16 M.J. at 742 (citations omitted).

In my judgment, the appropriate remedy is to set aside the findings of guilty and the sentence, and dismiss, without prejudice, the charges and specifications. This remedy is proportionate in three respects: (1) even in the absence of any intent to coerce the accuser here, when "coercion influence[s] the preferral of charges," the CAAF has regarded "such charges as 'unsigned and unsworn,'" *Weasler*, 43 M.J. at 18 (quoting *Hamilton*, 41 M.J. at 36); (2) a different accuser may independently conclude that administrative action is insufficient to address Appellant's culpability; and (3) Appellant should not be penalized by the delay to more fully develop the record owing to the military judge's failure to make findings of fact and conclusions of law on Appellant's claim of UCI during referral.[53]

In this regard, I depart from my esteemed colleague, Judge Meginley, and find Appellant has not demonstrated that dismissal with prejudice is warranted under the circumstances here. Additionally, I disagree with Judge Meginley's suggestion that actual or apparent UCI by Maj Gen Doherty plausibly reached the adjudicative stage of Appellant's court-martial.[54] Unlike my colleague, I find no legitimate questions about the credibility of the evidence used

---

[53] *See United States v. Harvey*, 64 M.J. 13, 21–23 (C.A.A.F. 2006) (military judge's failure to fully inquire into the matter of adjudicatory UCI raised during trial is a relevant consideration to setting aside the findings and sentence without prejudice as the appropriate remedy).

[54] During litigation on the UCI motion, trial defense counsel conceded there was no actual UCI by Maj Gen Doherty that reached PB. In this regard, I join Judge Richardson in finding the military judge did not abuse his discretion in finding the Government met its burden beyond a reasonable doubt that there was no UCI committed by Maj

to convict Appellant. I also decline to speculate as to the reach of the UCI if Appellant is tried again, or that any litigation that ensues might be protracted.

Finally, and in the alternative, I have considered whether dismissal with prejudice is necessary owing to Appellant's challenge to the legal and factual sufficiency of his convictions. Viewing the evidence in the light most favorable to the Prosecution, I join Judge Richardson in finding a rational factfinder could have found Appellant guilty of all the elements of both offenses beyond a reasonable doubt, and that the evidence is legally sufficient to support Appellant's convictions. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, I also conclude the evidence is factually sufficient and am convinced of Appellant's guilt beyond a reasonable doubt. Therefore, I find Appellant's convictions both legally and factually sufficient, and dismissal with prejudice is not warranted on this alternative basis.

### E. Timeliness of Appellate Review

#### 1. Law

Whether an appellant has been deprived of his due process right to appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *Moreno*, 63 M.J. at 135 (C.A.A.F. 2006)).

A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed with a Court of Criminal Appeals. *Moreno*, 63 M.J. at 142. If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136 (citation omitted).

---

Gen Doherty as pertains to PB's testimony. The evidence demonstrated PB was not present at Maj Gen Doherty's teleconference, PB's initial statement to law enforcement happened months before the teleconference, and PB's later statements and testimony about the firearm incident were substantially unchanged from earlier statements he made. The Government met its burden to disprove actual and apparent UCI here beyond a reasonable doubt.

Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our Article 66(c), UCMJ, authority, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

**2. Analysis**

Appellant's case was originally docketed with the court on 30 October 2019. The overall delay in failing to render this decision by 30 April 2021 is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine there has been no violation of Appellant's right to due process and a speedy appellate review. Analyzing the *Barker* factors, we find the delay is not excessively long. After docketing, we granted ten enlargements of time for Appellant's military appellate defense counsel to prepare a brief in support of the assignments of error and the reply. Among the reasons for the delay is the time required for Appellant to file his brief on 1 October 2020, and the Government to file its answer on 5 November 2020. Appellant filed a reply on 24 November 2020.

Appellant has not pointed to any prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation. *See id.* In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted.

### III. CONCLUSION

The findings of guilty and the sentence are **SET ASIDE**. Specification 1 of Charge II and Charge II, and Specification 1 of Charge III and Charge III are **DISMISSED WITHOUT PREJUDICE** to the Government's right to reinstitute court-martial proceedings against Appellant for the same offenses. The case is returned to The Judge Advocate General. A rehearing is authorized

with regard to the dismissed charges and specifications. Article 66(e), UCMJ, 10 U.S.C. § 866(e).

MEGINLEY, Judge (concurring in part, dissenting in part, and dissenting in the result in part):

## A. Unlawful Command Influence

I agree with Senior Judge Posch's analysis that Appellant's conviction for aggravated assault should be set aside as a result of the unremediated actual and apparent unlawful command influence (UCI) in the accusatory phase of Appellant's court-martial. Conversely, I disagree with Judge Richardson that this case should be remanded for further development of the record. First, there are ample facts in the record to conclude there was actual and apparent UCI exerted on the convening authority, Lt Gen Cotton. Second, it is doubtful that remanding this case will cure the numerous concerns, issues, and problems in this case. "It is the Government's duty to prove beyond a reasonable doubt that an objective, disinterested observer would not harbor significant doubt about the fairness of the proceedings." *United States v. Proctor*, No. 20-0340, ___ M.J. ___, 2021 CAAF LEXIS 509, *30 (C.A.A.F. 2021) (Stucky, C.J., dissenting). The mere fact that many of the individuals who played a part in this case would have to be called to testify about events that occurred three years ago, in light of the issues identified in the lead opinion, would cause any objective, disinterested observer to harbor significant doubts about the fairness of the proceedings.

Having identified UCI, I must ascertain if the remedy to which Appellant is entitled should allow the Government to continue the judicial proceedings and initiate a second court-martial, or dismiss this case with prejudice. To this end, I am mindful that "[t]he exercise of command influence tends to deprive servicemembers of their constitutional rights." *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986). In determining a remedy, and recognizing that a dismissal of charges is a "drastic remedy," I considered if a dismissal of the charges was warranted based on whether Appellant would be prejudiced or no "useful purpose would be served by continuing the proceedings." *See United States v. Barry*, 78 M.J. 70, 79 (C.A.A.F. 2018); *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004). "[D]ismissal of charges with prejudice . . . is an appropriate remedy where the error cannot be rendered harmless." *Gore*, 60 M.J. at 189. Ultimately, I disagree that UCI can be resolved simply by setting aside the findings and dismissing without prejudice. In my judgment, limiting the remedy to setting aside the findings and sentence falls short of the relief necessary to correct the unremediated UCI in this case. I come to this decision for the following reasons.

First, the lead opinion primarily focuses on the actions (or inactions) of Lt Gen Kwast, Lt Gen Cotton, and Brig Gen Niemi after the case was transferred from the Nineteenth Air Force commander (19 AF/CC), Maj Gen Doherty. If their actions were our sole focus, setting aside this case without prejudice might be the appropriate remedy. Yet, this court must look at all actions and decisions leading up to the transfer, which raise legitimate questions about the credibility of the evidence used to convict Appellant.

The record supports the valid concerns Maj Gen Doherty generally had about the Laughlin AFB leadership, including their handling of Appellant's behavior and issues. Most objective persons would agree brandishing a loaded weapon at someone is a serious offense. Further, Appellant had a troubling history. In his testimony to Lt Gen Thomas Bussiere, the Investigating Officer for the Air Education and Training Command (AETC) Commander-Directed Investigation (CDI), Colonel (Col) RP, the 47th Operations Group commander (47 OG/CC), stated, "[W]e knew [Appellant] was a severe risk to himself and others. As we found out more, it doesn't get any better. It's even worse." Col RP highlighted perhaps one of the biggest issues for everyone dealing with Appellant's issues:

> At the same time, there's initial assessments where he [Appellant] is not a danger to himself. Some of his peers would tell you that. It was incongruent, hard to rectify. What you have the ability to do legally and from a command standpoint, this is where I share General Doherty's feelings.

However, as the handling of Appellant's issues quickly progressed, the record also shows Maj Gen Doherty, whether intentional or not, contributed to an institutional fear in Appellant that potentially tainted witnesses, impacted Appellant's mental health providers, conflicted the judge advocates who were advising the command, and empowered the Air Force Office of Special Investigations (AFOSI) to portray Appellant as an immediate threat to the base, despite the fact that the weapons incident involving PB occurred nearly ten months earlier. Instead of being a one-specification aggravated assault case involving PB, it morphed into a multi-charge, nine-specification case, supported by fragile facts.

I do not believe this to be conjecture. I present four examples from the record:

a. On 23 August 2018, an active shooter exercise occurred at Laughlin AFB. Appellant was working for the Force Support Squadron whose commander directed Appellant to inquire about the base marina's active shooter procedures. Appellant, who at the time was living in a recreational vehicle at the base marina, asked the marina clerk about the active shooter procedures.

On 7 September 2018, 15 days after the active shooter exercise, AFOSI learned about Appellant's inquiry. The regional AFOSI commander contacted the 19 AF/CC and told him that Appellant inquired about active shooter procedures at the marina prior to moving out. According to the AETC CDI (authored by Lt Gen Thomas Bussiere, the Investigating Officer), "Alarmed, the 19 AF/CC called the [47th Flying Training Wing commander (47 FTW/CC)]; encouraging immediate action to avoid an active shooter situation. 47 FTW/CC issued a BOLO (be on the lookout) and have [47th Security Forces Squadron] place a patrol car outside Club XL to safeguard a graduation event occurring there that night." Appellant was at the on-base stables feeding his horses.[1]

b. On 7 September 2018, AFOSI's chief investigative psychologist assessed Appellant was a risk to others, based on information in the AFOSI case file. This assessment was distributed to various members of the command. Upon reading the report, 47th Medical Group Commander at Laughlin AFB, Col AC, opined, "[T]his document has been all over the Air Force now that is not really an official document in any way in my mind and disclosing information about a person that no one has a clue about. So their psychologist decided that they're going to make their own decision that this guy is going to shoot up the base basically." Col RP also had reservations about the assessment: "I wasn't initially aware of a psych profile from [AF]OSI . . . I didn't know what they were doing. I had heard that 19th Air Force had directed AFOSI to get involved and do an assessment . . . My problem with that was that it was not only uninformed, they didn't interview anybody. They used what was gathered . . . Although I agreed with their assessment (that Captain Butler was a threat and could become violent), when you go from the evidence that they were given, there was just a lot more context that I disagreed with."[2]

c. On 9 September 2018, AFOSI initiated a 24-hour surveillance of Appellant. This lasted until at least 23 September 2018. On 20 September 2018, the local Civil Engineer Squadron, with 47 FTW/CC's concurrence, installed monitoring cameras to allow AFOSI to view Appellant's temporary off-base residence.

---

[1] According to 47 OG/CC, 47 FTW/CC received a call "I think from [Maj Gen] Doherty[,] that they had information that Captain Butler was on the loose and was a threat. What was relayed to me was along the lines of he is roaming the base and he is going to shoot people up. He was going to go active shooter."

[2] AFOSI acknowledged Col RP's concern. This caveat was in the report: "This is a psychological analysis designed to provide some insight into the investigation. This consultation is not meant as a psychological evaluation of SUBJECT [Appellant]. SUBJECT was not seen or interviewed for this consultation. Conclusions drawn in this consultation could substantially change if new information becomes available."

d. In his testimony to Lt Gen Bussiere, Col AC provided information regarding Appellant's mental health diagnosis, or lack thereof. Col AC stated that he believed 19 AF/CC wanted a mental health diagnosis so leadership could go seize Appellant's weapons at his house. "We were trying to get coerced to come up with something. And that's what I get offended with. Don't tell a group commander who has 27 years of experience in mental health overall . . . . that we're going to give a guy a mental health diagnosis or put this guy in inpatient substance abuse treatment. And don't try to coerce my major to try and do the same . . . And then getting 19th Air Force JA advice that, hey, this person probably should be in inpatient."

After learning of new information about Appellant, the next day, Appellant received a diagnosis, which was not disclosed in Col AC's testimony.[3]

There is also the testimony from PB during motions. PB stated he "felt pressure that [he] needed to make statements that showed that we had threats in the squadron." PB further stated:

> Defense Counsel (DC): Pressure to make statements about threats?
>
> PB: Correct.
>
> DC: With relation to Captain Butler?
>
> PB: Yes.
>
> DC: This was sort of, at least from your perspective, derivative of the [19 AF/CC] phone call?
>
> PB: Yes.

---

[3] Col AC's testimony to Lt Gen Bussiere is disconcerting about the handling of Appellant's issues. Col AC was concerned that the leadership

> poke[d] at this guy . . . anybody would be suicidal. We keep on trying to find something wrong with this guy, you know, why wouldn't he be? . . . Now we're trying to say that he's an abuser and now we're trying to say that this guy may be suicidal if he drinks, so, like, okay, let's just push this guy over the edge because we keep on trying to find something on him.

Col AC also stated he felt leadership was looking for something on Appellant:

> When I say "find something," I'm not just referencing his mental health evaluation. I'm talking about anything. Administratively. Anything . . . What I'm saying is that if you keep pushing somebody more and more to try to find something, you know, that's what I think's happening here . . . .

DC: So even though ----

PB: One hundred percent.

DC: One hundred percent?

PB: Yes.

DC: Okay. So, even if you were not present directly during that call, it sounds like the pressure put on you and everybody else similarly situated sort of rolled out from there?

PB: Correct.

. . .

DC: Over the course of this sort of – these couple of months, so between the time you are aware of the [19 AF/CC] phone call leading all the way up until the day when everybody gets fired, is this the period of time in which you felt this pressure to sort of make statements that were negative towards Captain Butler?

PB: Yes.

DC: Okay. And at least in your perspective, was that a pressure that was being applied not just to you, but to your peers as well?

PB: Yes.

DC: What about your leadership, at least as far as you understood it?

PB: . . . [Y]es, there was definitely a perception of pressure from the two-star at 19th Air Force driving down to direct what was going on in the squadron.

DC: And sort of pressure for you all to give evidence for some – or to make statements that Captain Butler was a threat to everybody.

PB: To blow things out of proportion, yes.

In a 26 September 2018 email to Lt Gen Kwast, Maj Gen Doherty acknowledged influence was an issue, stating,

> [T]he team at Laughlin is aware of my concern for their lack of engagement, judgment, and inaction when I became aware in August of Capt Butler's more recent misconduct in July and minimizing the known misconduct over a 9 month period since Nov 2017 . . . . While I am confident that the current CDI does not influence any decision I would make on disposition of this case and that my engagement has not caused me to pre-judge any

facts, there are too many arguments that a savvy defense counsel could make that would distract attention from the case against Capt Butler and could jeopardize any potential conviction, should the evidence prove his guilt beyond a reasonable doubt. My objective is to minimize any avoidable legal issue that the leadership problems of Laughlin have created in the disposition of this case and to ensure this case is not only fair, but also perceived as fair by anyone who is familiar with the circumstances. Also, due to the fact that 19 AF leadership and legal team were required to step in and act, [the 19 AF SJA] is also probably "too close" to this case and the perception of objectivity could be questioned by defense counsel with regards to legal advice to a convening authority.

To exacerbate this situation, the delay in [Numbered Air Force (NAF)] command actions, due to the ongoing CDI, has made it necessary for 19 AF to continue to closely monitor, mentor, course correct, and could be argued that 19 AF has influenced decisions regarding Capt Butler since 9 Aug.

With this email in mind, I turn to Lt Gen Bussiere's assessment of the situation:

While all influence between superior and subordinate commander is not unlawful, directing a subordinate commander to order certain actions would be unlawful. It is conceivable the 19 AF/CC and his advisors were unaware that the directives of the 19 AF/CC were not *persuading* subordinate commanders to change their positions and exercise their independent judgement to give dictated orders. However, the tone, tenor and repeated clash of positions between 19 AF and the 47 FTW should have made it clear by 10 August 2018, that there was a wide understanding and judgement gap between the commanders. In the end, whether the 19 AF/CC perceived or intended unlawful command influence is irrelevant. The mere appearance of unlawful command influence can be as devastating to public perception about the fairness of our system as actual unlawful command influence. Should [Appellant] face court-martial as a result of the current investigation, the CDI team recommends all decisions regarding his case be removed from the 47 FTW and 19 AF.

The record is clear that Maj Gen Doherty was right to be concerned about Appellant. *See* Judge Richardson's opinion, part A, Description of All Charges, *infra*. The record is also clear that had he remained the convening authority, I

believe a military judge would have found UCI and dismissed this case. I simply believe his involvement tainted this case beyond repair. Recognizing that he was not the convening authority, the ramifications of the actions taken by (or those supported by) Maj Gen Doherty did not simply vanish once this case was turned over to Lt Gen Cotton. In preferring the charges in this case, Brig Gen Niemi relied on AFOSI's Report of Investigation (ROI), with many of the witnesses, still under Maj Gen Doherty's command. Given Brig Gen Niemi's reliance on this document, I cannot assess how credible many of the statements are, especially in light of Lt Gen Bussiere's investigation. Short of opening a new investigation with a different AFOSI detachment, I believe the lingering effects of Maj Gen Doherty's actions would remain if Appellant was tried again.

Second, it bears repeating that before UCI tainted these proceedings, Appellant's squadron commander had evaluated the two incidents that underlie Appellant's convictions, and determined that a court-martial was not appropriate. He then exercised his independent discretion by taking administrative action. In this manner, Appellant has been lawfully held to account for his conduct. A reasonable observer would have significant doubt about the fairness of remand and retrial because, as to the more serious of the two incidents, the commander's disposition was in line with the advice he received from his staff judge advocate (SJA). What is particularly telling is that this course of action was not a secret. In an email from 47 FTW/CC on 5 January 2018, the 47 FTW SJA stated that he discussed Appellant's case with the Nineteenth Air Force Office of the Staff Judge Advocate (19 AF/JA) and that the case was "trending towards administrative discipline" and disposition of the case was possible Letter of Admonishment (LOA). On 25 January 2018, Appellant was served a LOA for the incident against PB.

When this disposition was evaluated by the AETC CDI, Lt Gen Bussiere found the advice to be reasonable, stating,

> At the time, the 47 FTW/JA advised the commander that an LOA, an administrative action, would be appropriate. To evaluate the quality of the legal advice, based on the information available at the time, the CDI team requested an independent evaluation from [a] [lieutenant colonel] attorney with both staff judge advocate and extensive criminal trial experience.

> Analyzing the conduct of 16 to 17 November 2017, the independent legal opinion concluded that an [Letter of Reprimand] or LOA was reasonable for the conduct . . . .

> Considering assault, an act of force of [sic] violence is unlawful if done without legal justification. It was lawful for Captain [Butler] to carry a firearm in his own residence and to draw it in the face of an unexpected intruder. He had no duty to retreat and did holster the weapon after identifying the intruder. Under these facts, assault most likely could not be proven . . . . [I]t was reasonable for the legal office to recommend that the incident be addressed through an administrative actions such as an LOA or LOR.

The 19 AF/JA was aware of Appellant's issues (particularly the incident documented by LOA), and more than likely, given that a special interest report (SIR) was distributed, it is quite reasonable to believe that AETC/JA was aware as well. Maj Gen Doherty may have been surprised to learn about Appellant in August 2018; the judge advocates were not – and there is nothing to suggest that before Maj Gen Doherty learned about Appellant's issues on 8 August 2018, that any senior Air Force leader or senior judge advocate had an issue with the legal advice being given about Appellant. Thus, any remedy short of dismissal with prejudice would countermand the squadron commander's initial decision that was untainted by UCI. I see no useful purpose would be served by remanding for a third disposition.

Third, dismissal with prejudice "is an appropriate remedy where the error cannot be rendered harmless." *United States v. Lewis*, 63 M.J. 405, 416 (C.A.A.F. 2006) (citing *United States v. Gore,* 60 M.J. 178, 189 (C.A.A.F. 2004)). I have already noted potential witness issues. Additionally, Appellant had been charged with offenses against the UCMJ by a commanding general upon whom a command relationship was thrust to marshal Appellant through judicial proceedings. Along with the potential witness issues, were we to authorize remand and preferral anew, a reasonable observer would harbor significant doubt that a different accuser and referral authority reached their decisions free from undue influence of the commanding generals who influenced or took action in the proceedings here. Under such circumstances, I am not convinced that remand "will eradicate the unlawful command influence and ensure the public perception of fairness in the military justice system." *Id.* To the contrary, continuing the proceedings will likely perpetuate the prejudice of an already protracted litigation that ensued after Appellant's squadron commander lawfully disposed of the incidents under review.

Fourth and finally, it must be recalled that one of the reasons Brig Gen Niemi acknowledged that trial by court-martial was appropriate was to bolster trust in the system because of the significant amount of media attention, focus, and curiosity, both inside and outside of the Air Force. Yet, it is hard to reconcile Brig Gen Niemi's position with the comments from the record. It is also

hard to reconcile this position with the fact that the military judge credited Appellant with 63 days of confinement credit for numerous Article 13, UCMJ, 10 U.S.C. § 813, violations committed before trial, including the grant of fifteen days of credit for Appellant's restriction to access his weapons while at Maxwell AFB, after Brig Gen Niemi inherited the case (the military judge ruled that because possessing weapons was a constitutional right, there was no nexus to a legitimate military function for this restriction). There is no disputing the public interest society has in holding guilty offenders accountable. It is equally true that public perception of fairness in the military justice system is enhanced by a remedy that may restore some measure of confidence in the fairness of that system. Like the United States Court of Appeals for the Armed Forces, I remain mindful "that unlawful command influence is the 'mortal enemy of military justice,' and we will meet our responsibility to serve as a 'bulwark' against it by taking all appropriate steps within our power to counteract its malignant effects." *United States v. Boyce*, 76 M.J. 242, 253 (C.A.A.F. 2017) (quoting *Thomas*, 22 M.J. at 393).

In conclusion, PB testified in motions that had this been a civilian case, he would not have pressed charges, and that his "whole entire goal that night was to make sure that [Appellant] was okay." When Maj Gen Doherty intervened in this case, although there was conflicting evidence as to whether Appellant was a threat to anyone, there were indications Appellant had been compliant in his treatment programs, and that he had no mental health diagnosis. 19 AF/JA was aware of Appellant's misconduct (the weapons incident) shortly after it occurred, and based on discussions with 47 FTW/JA, was aware of the imposition of an LOA. In light of the influence Maj Gen Doherty had on this case, coupled with the UCI committed by Lt Gen Kwast, I simply cannot assess whether the harm and taint placed on the witnesses involved in Appellant's trial would carry over to another trial. I do not believe these command actions were harmless to Appellant and fully believe that the UCI in this case put an *intolerable strain on the public's perception of the military justice system.* "Where it is found to exist, judicial authorities must take those steps necessary to preserve both the actual and apparent fairness of the criminal proceeding." *Lewis*, 63 M.J. at 407 (citing *United States v. Rivers*, 49 M.J. 434, 443 (C.A.A.F. 1998); *United States v. Sullivan*, 26 M.J. 442, 444 (C.A.A.F. 1988)). "The appearance of the evil of command influence is as much to be avoided as the actual use of such influence." *United States v. Rodriguez*, 16 M.J. 740, 742 (A.F.C.M.R. 1983) (citations omitted). Turning this case over to a new convening authority outside of AETC "would only serve to lengthen a protracted litigation that has already reached its natural conclusion." *Barry*, 78 M.J. at 79. I

conclude dismissal with prejudice is the only appropriate remedy to preserve both the actual and apparent fairness of Appellant's proceeding.[4]

## B. Drunk and Disorderly Charged Offense

In light of the court's decision to set aside the case without prejudice, there is one additional matter that has to be addressed, which concerns the drunk and disorderly charge and specification. I disagree with my esteemed colleagues regarding Appellant's conviction under Article 134, UCMJ, 10 U.S.C. § 934, for drunk and disorderly conduct. Regardless of whether there was UCI, in looking at the evidence presented at trial, and viewing that evidence in light most favorable to the Government, I find this charge and specification factually insufficient, as the Government simply did not prove that Appellant's behavior was "disorderly."

This court examined the parameters of drunk and disorderly behavior in *United States v. Morrow*, No. ACM 39634, 2020 CCA LEXIS 361 (A.F. Ct. Crim. App. 1 Oct. 2020) (unpub. op). In *Morrow*, the panel stated,

> [T]he offense of disorderly conduct is characterized by conduct that involves aggressive, violent, destructive, or objectively offensive behavior. That is, they involve real and non-hypothetical threats to personal safety and property. The definition of 'disorderly' in the *[Manual for Courts-Martial, United States]*, at first blush, simply requires conduct 'affect[ing] the peace and quiet of persons who may witness it and who may be disturbed or provoked to resentment thereby,' but the definition goes on to explain it includes 'contentious or turbulent' conduct and that which 'endangers public morals or outrages public decency.' *Id.* at *28.

Considering the court's language from *Morrow*, coupled with cases cited as examples in *Morrow*, I view the phrases "contentious or turbulent nature" and "endangers the public morals or outrages public decency" as illustrating the sort of conduct which amounts to a criminal disorder. The question becomes whether Appellant's conduct falls within the term's definition. The evidence shows it did not.

---

[4] Although I would set aside this case with prejudice for UCI, if I were looking at this case in a vacuum focusing simply on the testimony and evidence involving PB, I would find the charge and specification, as related to PB, legally and factually sufficient. Although PB felt there was some influence to "blow things out of proportion," the record repeatedly indicates PB was consistent with his version of events involving Appellant. I concur with Part D of Judge Richardson's opinion.

Appellant's squadron commander, Lt Col TA, had an open door policy for people to come to talk to him. One of the witnesses to the allegation, Capt HP, testified about the November 2017 mishap, stating the squadron "[was still] fairly emotional about" this event. Further, Capt HP testified he had once approached Lt Col TA after drinking to discuss a matter with Lt Col TA, so Appellant's decision to visit Lt Col TA's office after drinking appears to have not been unusual. There was no evidence that Appellant's behavior was contentious or turbulent, nor did he endanger public morals or the like, nor did his behavior cause any direct and palpable injury to good order and discipline. Additionally, part of this incident occurred at the squadron heritage bar, where one witness stated, "It is common" for squadron members to drink to Appellant's level of intoxication. Appellant's behavior was not violent or destructive, nor was his behavior objectively offensive. There was no threat to personal safety and property. The military judge found as fact that Appellant was verbally counseled for the incident at the time it occurred, and Lt Col TA even recommended Appellant be taken off of no-flying status after the incident, as Appellant had "complied with his treatment plan and had demonstrated a demeanor compatible with instructor flight duties." Finally on this point, not once during his testimony did Lt Col TA say he felt Appellant's behavior was disorderly, or akin to being disorderly, or prejudicial to good order and discipline;[5] the worst Lt Col TA said about Appellant's behavior was that it was "inappropriate." Inappropriate behavior does not mean that behavior is disorderly, or for that matter, criminal.

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, I am not convinced of the factual sufficiency of Appellant's guilt beyond a reasonable doubt. Neither the testimony from Lt Col MH or Capt HP, both of whom had been drinking with Appellant, is convincing. The best the Government could argue that supports the allegation that Appellant's behavior was disorderly and prejudicial to good order and discipline was Lt Col MH describing Appellant as "look[ing] disrespectful," and Capt HP testifying that Appellant stated, "Don't f*cking touch me." Perhaps there was other evidence justifying this charge that did not come out at trial. Yet, on its face, this highly subjective allegation, handled by the squadron commander with a ***verbal counseling***, appears to be nothing more than a piling on by the convening authority, and in many ways, is a microcosm of just how far some AETC leaders, and the judge advocates advising them, were willing to go to secure a conviction. As the testimony and law did not

---

[5] With this said, the commander's failure to specifically describe how Appellant's behavior was prejudicial to good order and discipline is not necessarily fatal to the military judge finding Appellant guilty. *See United States v. Snow*, No. ACM S31496, 2009 CCA LEXIS 65, at *7 (A.F. Crim. Ct. App. 24 Feb. 2009) (unpub. op.).

support this charge, I find this charge to be factually insufficient and would set aside this charge and specification with prejudice.

RICHARDSON, Judge (concurring in part, and dissenting in part and in the result):

I agree with Senior Judge Posch that the offenses of which Appellant was convicted are legally and factually sufficient. I also agree that the delay in appellate review does not warrant relief.

I appreciate Senior Judge Posch's thorough analysis of unlawful command influence, and agree with one aspect: it is unclear whether the military judge found some evidence of unlawful command influence on the convening authority who referred the charges to a general court-martial, although a de novo review reveals Appellant met his initial burden. I find the Government failed in its burden to prove either that the predicate facts did not exist or that no objective observer would doubt the fairness of the proceeding beyond a reasonable doubt as a result. I come to this conclusion because of the absence of fully developed facts necessary to resolve this portion of the Defense motion. "[T]he military judge must engage in a sufficient inquiry as a matter of law to uncover sufficient facts to decide the issue before him." *United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979).

Because, on this record, I am unable to conclude there was no actual or apparent unlawful command influence on the convening authority due to the dearth of facts surrounding the referral, I support remand to fully develop the record as an appropriate avenue to address this deficiency. I do not agree that dismissal without or with prejudice is warranted in this case. I would find the Government proved beyond a reasonable doubt that any unlawful command influence in the preferral stage of Appellant's court-martial did not place an intolerable strain upon the public's perception of the military justice system. To this end, I identify essential facts relevant to my separate conclusions, and respectfully dissent.

## A. Description of All Charges

When considering the issues concerning unlawful command influence raised in this case, I cannot ignore the preferred and referred charges brought against Appellant. Several specifications alleged serious misconduct, and were supported by first-hand accounts. Appellant was charged with holding a knife

to TW's[1] throat, saying "I could just slit your throat, and you couldn't do anything about it." He was charged with pointing a loaded rifle at TW's head, saying "it would be so easy to just kill a man." He was charged with pointing a loaded handgun at TW's head. He was charged with twice pointing a loaded firearm at his wife, once in conjunction with a suicidal gesture. And he was charged with twice having a firearm on base against base regulations. These charges were in addition to those of which he was convicted, which were pointing a loaded handgun at PB, saying something like "so you are afraid to die," and confronting his commander while drunk. Any conclusion that these allegations should have been handled by administrative action is absurd. These allegations warranted a general court-martial.

## B. Influence of the Nineteenth Air Force commander (19 AF/CC)

Contrary to Appellant's claims on appeal, Maj Gen Doherty's actions did not result in undue pressure "to make exaggerated statements against [Appellant]" relevant to the charged offenses. While TW and PB—both eyewitnesses to Appellant's alleged misconduct—knew of some of Maj Gen Doherty's actions, they were motivated thereby to share more information and to be truthful. The evidence also does not show that either Air Force Office of Special Investigations (AFOSI) agents or the witnesses they interviewed exaggerated Appellant's misconduct.

### 1. Witness Testimony

The evidence indicates TW attended a post-19 AF/CC teleconference meeting with the Laughlin AFB wing commander (47 FTW/CC); the 87th Flying Training Squadron commander (87 FTS/CC), Lt Col TA; and many others. As 47 FTW/CC was discussing the way ahead, he said, "It's not like [Appellant has] ever brought a weapon to work, or has he?" TW spoke up and said he found a gun in Appellant's office.[2] Later, Special Agent (SA) JH from AFOSI questioned TW in regards to safety concerns involving Appellant. TW felt obliged to provide information about Appellant for two reasons: 47 FTW/CC expected "any and all information . . . shared for the interest of safety," and, regarding Appellant, "so [SA JH] had a better idea who he was dealing with."

PB testified that he did not attend a call with Maj Gen Doherty. He was on leave at that time, and heard about it a few days later. He explained in direct-examination what he heard:

---

[1] At the time of the offenses involving him, TW was Appellant's housemate and fellow instructor pilot.

[2] This information formed the basis of a specification alleging dereliction of duty of which Appellant was acquitted.

Q [Circuit Trial Counsel]. Did you later have occasion to learn about what happened on that phone call, about what that phone call was all about?

A [PB]. No.

Q. Did you ever learn what that phone call was all about?

A. No -- yes.

Q. Please explain.

A. Through just the grapevine, if you will, the rumor mill, I got wind that it was about [Maj Gen] Doherty had finally received knowledge, if you will, of events that were going on in the squadron. It was like information that he'd already been given and supplied by [Lt Col TA], but finally it was just -- enough finally got to him that he decided he needed to make a phone call and say, "What the hell is going on down there?" And that was basically what I understood it was. What is going on? Why are there concerns with [Appellant]? Why are there concerns in the squadron? What is going on? Is it being handled sufficiently down there? And that was all I really got from the rumor mill.

PB felt some pressure flowing from the 19 AF/CC teleconferences to make statements that showed Appellant was an actual threat to the squadron, and to make it seem like Lt Col TA was a bad leader. However, PB did not change his statement about the aggravated assault as a result of this pressure. While PB believed Maj Gen Doherty "exuded unlawful command influence through [19 AF]," he maintained that Maj Gen Doherty's "expectations" did not impact his testimony. The following exchange on cross-examination is illustrative:

Q [Circuit Defense Counsel]. [PB], you mentioned that you didn't feel any pressure about your statement. What kind of pressure -- so, in aftermath of what you know now to be the [Maj Gen] Doherty phone call, what kind of pressure did you feel was present?

A [PB]. *Nothing about the November incident.* I felt more pressure about trying to prove that there was a situation of hostility within the 87th, within our squadron. I felt pressure to make it seem like [Lt Col TA] was a poor leader, and that the wing leadership didn't back him. I felt pressure that I needed to make statements that showed that we had threats in the squadron.

Q. Pressure to make statements about threats?

A. Correct.

Q. With relation to [Appellant]?

A. Yes.

Q. This was sort of, at least from your perspective, derivative of the [Maj Gen] Doherty phone call?

A. Yes.

Q. So even though ----

A. One hundred percent.

Q. One hundred percent?

A. Yes.

(Emphasis added.)

The cross-examination of PB pivoted from whether he felt pressure to say Appellant was a threat, to whether he thought Appellant was a threat:

Q. And sort of pressure for you all to give evidence for some -- or to make statements that [Appellant] was a threat to everybody.

A. To blow things out of proportion, yes.

Q. Even though you all -- you have been pretty clear that you didn't believe -- you all, at the time, didn't believe [Appellant] to be a threat at the time.

A. At the time, I looked at it and I said, you know, if I was to go through all of the case studies that we have, you know, the Randolph shooting, Nidal Hassan, and all of those things, there were red flags, sure, but there's nothing you can do until something actually happens. All that we did, me, Captain G[ ], Major F[ ], Captain [HP], we just spoke and said, there are some red flags, and we just need to make sure that he is okay, and that we need to take care of him. No – business as usual in the squadron. We are not about to shut the squadron down and stop flying. There was no threat like that. He is not going to walk in here and start doing anything crazy. We just need to keep an eye on him.

Thus, it appears PB thought Appellant was a potential, but not an immediate threat, and not until Maj Gen Doherty intervened did he feel pressure to raise his concerns.

Finally, in response to the military judge's question, "Did you actually add or subtract anything from a statement because you felt you were compelled to do that?" PB replied, "I don't believe I did. No." And put another way:

Q [Military Judge]. Did those perceived expectations -- the expectations that you perceived [Maj Gen] Doherty to have, did those impact any information that you provided with regard to the criminal investigation into the matters here today?

A. No.

The military judge found that TW and PB were aware that Maj Gen Doherty had communicated with installation leadership and "there was discontent within the chain on the handling of [Appellant's] case to some extent," but they were not present during a teleconference with Maj Gen Doherty. He also found they felt free to provide truthful information to investigators and as court-martial witnesses, did not fear retaliation for their truthful testimony, and "the actions of the 19 AF/CC, either real or perceived, would have no impact on their ability to testify as to the personal information they had. The court found both members credible and candid during this testimony . . . ." The military judge's findings are supported by the record, and satisfy me that these witnesses were not, in actuality or appearance, tainted by unlawful command influence.

### 2. AFOSI

SA JH had attended the third 19 AF/CC teleconference. Sometime afterwards, SA JH spoke to his AFOSI leadership about Appellant's escalating violence. He reviewed the Security Forces investigation into Appellant's aggravated assault against PB and deemed it inadequate from an investigatory standpoint. Sometime between late August and early October, SA JH and his leadership made the independent decision to open an investigation into Appellant based on safety concerns.

Maj Gen Doherty did not order AFOSI agents to open an investigation into Appellant. Instead, his actions merely alerted them to Appellant's history; the agents made an independent decision to open their own investigation. The military judge found that "[w]hile SA [JH] was present during the teleconference with 19 AF/CC, he testified credibly on the stand that the decision to open the investigation was his and his alone and was not the result of a direction of the 19 AF/CC." I agree, and this finding is not clearly erroneous.

### C.  Brig Gen Niemi and Media Attention

Brig Gen Niemi did not testify that media attention was a reason he preferred charges against Appellant. Sometime after preferral, Brig Gen Niemi recommended to deny Appellant's request to resign in lieu of trial by court-martial (RILO). Brig Gen Niemi testified he "was balancing what was likely to happen if the case went forward in a court-martial with the benefit to the Air Force, and the benefit with regard to transparency, and making sure that there

66

was no appearance that things were being swept [under] the rug." He elaborated that one of the factors he considered in recommending denial of the RILO request was the importance of transparency after the significant focus, both outside and within the Air Force, on the relief of the three commanders at Laughlin AFB:

> Q [Circuit Defense Counsel]. How did the relief from command of the three commanders that were relieved, how did that play into your sort of decision process regarding transparency and the RILO?
>
> A [Brig Gen Niemi]. Not at all.
>
> Q. Okay. So, did you believe that it was important for this -- for there to be sort of a transparent court process, because whatever this was, it resulted in the relief of three commanders?
>
> A. I believed it was important for -- the transparency was important because it is always important to bolster trust in our system. But in this case, there was a significant amount of media attention and focus on it and curiosity, both inside the Air Force and outside the Air Force.
>
> Q. And that is one of the reasons why a court-martial was appropriate, was because of things like that?
>
> A. This was one of my considerations that I weighed.

In the absence of more, I will not presume that before preferral Brig Gen Niemi weighed these same considerations related to the RILO.

## D. Aggravated Assault of PB

I find Specification 1 of Charge II legally and factually sufficient. After a disturbing phone call with TW, PB became concerned about Appellant's well-being. PB drove to Appellant's house and entered through an unlocked side door.[3] He greeted the dog, then called out to the Appellant as he walked through the house looking for him. As Appellant entered the house from the screened patio, PB said something like "Hey, dude. There you are. I'm glad you're okay." Appellant "drew a firearm and leveled it towards" PB. In response, PB "dropped to the floor and hid behind the couch" and screamed some expletives. Appellant said something like "Oh, so you are afraid to die," and PB replied, "Yes. I have a wife and kids. I don't want to die." After talking "for a

---

[3] PB had a key, which TW had given him for him to look after the home when he and Appellant were away.

moment," PB heard Appellant lower the gun, then PB looked around the couch and verified Appellant had re-holstered it.[4] PB "charged around the couch, and [PB] punched him in the stomach, [PB] punched him in the testicles, and [PB] disarmed him." Later, PB unloaded the firearm, which was a 45-caliber revolver. PB smelled alcohol on Appellant and saw an empty bottle of bourbon. TW was home at the time, and only after PB subdued Appellant did TW emerge from his room. PB enlisted TW to aid him in gathering and then removing some of Appellant's firearms from the home.

## E. Drunk and Disorderly Conduct

I find Specification 1 of Charge III legally and factually sufficient. The Government's evidence proved Appellant's conduct was disorderly and prejudicial to good order and discipline. Appellant and some other officers from the squadron were socializing in the squadron's heritage room—a break room and bar area. After about 20 minutes, Lt Col TA arrived in the building, and walked past the heritage room to his office. Appellant noticed, and moved to follow him. Appellant had been drinking alcohol and was visibly intoxicated. Appellant walked into Lt Col TA's office and approached his desk. He placed his hands flat on the side of the desk opposite Lt Col TA, and leaned in. He lowered his head, and said something like, "I know you don't trust me." Lt Col TA told Appellant "this is inappropriate" and asked him to leave his office immediately. As Lt Col MH, the assistant director of operations, escorted Appellant from the command suite and back down the corridor, Appellant stopped several times and "appeared to be thinking heavily if this is what he wants to do." Appellant turned and quickly headed back to the command suite. Lt Col MH managed to stop Appellant and get him to walk away from Lt Col TA's office and towards the parking lot, Appellant continued to stop but Lt Col MH convinced him not to go back a third time. None of the disorderly conduct occurred in the heritage room.

The witnesses—fellow officers—believed Appellant was intending to confront their commander inappropriately while drunk. Lt Col MH felt he needed to intervene to prevent such insubordination. Capt HP feared Appellant was going to accuse the commander of culpable action in the recent death of an instructor pilot from their squadron, and that Appellant's actions would get them both in trouble. That is, he thought Lt Col TA would erroneously ascribe Appellant's ill-advised confrontation to him and the other officers present. Lt Col TA felt Appellant's actions were inappropriate and, to prevent addi-

---

[4] This is in contrast to the conclusion in the Air Education and Training Command investigation, cited *supra*, that Appellant holstered his weapon upon learning the "intruder" was his friend PB.

tional contentious behavior, told Appellant to leave. Appellant clearly was agitated and emotional when he averted attempts to dissuade him from confronting the commander. Lt Col MH found Appellant's body posture and position in front of Lt Col TA to be "disrespectful" and he had never seen someone confront a commander in that way. In short, Appellant's conduct while drunk caused a commotion among the other Air Force officers present such that they felt intervention was appropriate to stop Appellant from further inappropriate behavior before their commander, and to minimize or prevent potential disciplinary action against themselves or Appellant. *See, e.g.*, *United States v. Beckett*, 49 M.J. 354, 357–58 (C.A.A.F. 1998) (upholding a conviction for disorderly conduct where appellant said his first sergeant was "f\*\*king with the wrong guy" and then glared at the first sergeant such that witnesses—senior in military grade and position—concluded he was trying to threaten and intimidate the first sergeant, yet did not think the appellant's conduct warranted intervention or on-the-spot correction).

Considering the foregoing, Appellant's convictions are legally and factually sufficient. Considering the evidence in the light most favorable to the Prosecution, I find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of the offenses of aggravated assault and drunk and disorderly conduct. *See United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018). Additionally, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, I am convinced of Appellant's guilt beyond a reasonable doubt. *See United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court